[Crim. No. 20910. Oct. 23, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
EARL LLOYD JACKSON, Defendant and Appellant.

[Crim. No. 21285. Oct. 23, 1980.]

In re EARL LLOYD JACKSON on Habeas Corpus.

274

COUNSEL

Joseph Shemaria, under appointment by the Supreme Court, for Defendant and Appellant and Petitioner.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

Opinion

**RICHARDSON, J.**—Defendant Earl Lloyd Jackson appeals from a judgment imposing the death penalty following his conviction of two counts of first degree murder and two counts of burglary. He also seeks a writ of habeas corpus based on his claim that he was ineffectively represented by his trial counsel. As will appear, we will affirm the judgment, and deny the petition for habeas corpus relief.

In October 1977, defendant was charged with the murders of Gladys Ott and Vernita Curtis. By a subsequent amended information, he was charged additionally with burglary of the residences of these two victims. As special circumstances authorizing imposition of the death penalty under the 1977 law applicable to this case (former Pen. Code, § 190 et seq.; all further statutory references are to that code unless otherwise cited), the amended information further alleged that (1) the Ott murder was wilful, deliberate and premeditated and was committed during the course of a burglary (*id.*, § 190.2, subd. (c)(3)(v)), and (2) defendant committed an additional act of first degree murder by killing Mrs. Curtis (*id.*, subd. (c)(5)).

Initially a public defender was appointed to represent defendant who then pleaded not guilty and denied the special circumstances allegation. Thereafter, the public defender's office declared that there existed a conflict of interest and Attorney Veganes was appointed to represent defendant. Numerous pretrial motions were made on defendant's behalf by Mr. Veganes, and denied by the court, including motions to: (1) suppress defendant's tape-recorded statement to police officers; (2) limit voir dire examination regarding the prospective jurors' beliefs concerning the death penalty; (3) conduct the voir dire examination of individual prospective jurors outside the presence of the other veniremen; (4) exclude the public audience during voir dire; (5) appoint an additional counsel to assist during the penalty phase; (6) permit a separate jury panel for the guilt and penalty phases; (7) disclose the prosecutor's "jury book," and (8) exclude as unduly prejudicial certain photographs of the victims.

Voir dire examination of the prospective jurors commenced on December 8, 1978, and was concluded on December 19. The guilt phase of the trial thereupon commenced and continued to January 8, 1979. Although defense counsel cross-examined prosecution witnesses exten-

sively and presented a lengthy closing argument, he offered no affirmative evidence on defendant's behalf and defendant did not take the stand. The jury found defendant guilty of two counts of first degree murder and two counts of burglary in the first degree, as charged. The jury also found to be true both of the special circumstances which were alleged in the information.

The penalty phase commenced on January 9. The People called two witnesses and rested; defendant presented no mitigating evidence. Following extended arguments by opposing counsel, the jury was instructed and commenced deliberations. On January 12, the jury fixed the penalty at death. Following denial of his motions for new trial, for arrest of judgment, and for modification of the verdict, defendant was sentenced to death for the Ott murder and to state prison as prescribed by law for the Curtis murder and the burglaries. The present appeal is automatic. (§ 1239.)

We summarize the factual background underlying defendant's offenses as gleaned from the trial record: On August 29, 1977, her neighbors found Vernita Curtis, an 81-year-old widow, lying unconscious on the bedroom floor of her apartment in Long Beach. Her television set, toaster and other items were missing. Mrs. Curtis lived alone. Paramedics called to the scene observed that she bore severe facial bruises and swelling, and subsequent examination disclosed multiple injuries to her head, neck and chest. After four days of hospitalization Mrs. Curtis died of her injuries.

A neighbor lady, Ilena Gaines, testified at trial that while Mrs. Curtis was being removed on a stretcher from the Curtis apartment, defendant, an acquaintance of Gaines, smiled and laughed and stated to Gaines, in the words of the witness, that "He was the one who did that. He said that he did that." On cross-examination Gaines further testified that she had been living with Elton Boyd who, in a separate trial, had been convicted of murdering Mrs. Curtis. Other evidence adduced at trial disclosed that Boyd was defendant's accomplice during commission of the Curtis murder.

The preliminary hearing testimony of another witness, Debria Lewis, was read into the trial record. She described a conversation with defendant on September 11, 1977, during which defendant pointed to a newspaper article reporting the Curtis murder and declared to Lewis,

"This is what I done." When Lewis asked defendant why he had so acted, he replied "If she had just been still—had been still and given him the money, that she would have been walking around today."

On September 7, 1977, Toni McDowell discovered the body of her mother, Gladys Ott, a 90-year-old widow, lying on a bed in Mrs. Ott's apartment which was directly across a hallway from the lower floor apartment of Mrs. Curtis who was both a friend and neighbor of Mrs. Ott. According to the witness McDowell, the Ott apartment was a "shambles" and a television set and toaster were missing. Mrs. Ott's face was badly bruised and she appeared to have been beaten to death. An autopsy disclosed numerous injuries, including massive facial and neck bruises, fractured ribs, and an extensive vaginal laceration apparently caused by insertion of a foreign object. Defendant's fingerprints were found on a closet doorjamb and on other objects in Mrs. Ott's apartment. According to the witness Lewis, defendant in his September 11, 1977, conversation with her described both ladies, Mrs. Curtis and Mrs. Ott, as "two old bags [who] were a nuisance and . . . got what they deserved."

A further witness, Debra Hall, defendant's cousin, testified that defendant, in referring to a news article concerning both the Curtis and Ott murders, acknowledged "This is what I did, that it was because I needed some money."

On learning that the police were seeking him, defendant surrendered to the officers and agreed to make a tape-recorded statement. In this statement, after initially denying any participation in the crimes, defendant ultimately admitted that he and others had burglarized both the Ott and Curtis apartments. Defendant also admitted that during these burglaries he hit Mrs. Ott once and held Mrs. Curtis while his accomplices were striking her.

Defendant's cellmates in the county jail, Mark Mikles and Ronald McFarland, testified at trial that defendant had admitted to them that he had killed both women. According to these witnesses, defendant boasted that he had repeatedly struck Mrs. Ott in the face, and had used a wine bottle to attack Mrs. Ott sexually.

At the penalty phase of the trial the prosecution introduced evidence regarding the aggravated nature of the Ott slaying, including further

evidence confirming defendant's sexual mistreatment of Mrs. Ott during the burglary. Defendant's counsel cross-examined prosecution witnesses and made a lengthy closing argument but declined to introduce any evidence on defendant's own behalf.

On appeal, defendant makes numerous arguments. We consider each contention separately and, because of the nature of the case, our analysis is somewhat extended. We conclude that none of the contentions has merit and that no miscarriage of justice has occurred in this case (Cal. Const., art. VI, § 13).

## 1. Request for Appointment of Additional Counsel

Defendant asserts that the trial court erred in denying his trial counsel's pretrial motion for the appointment of an additional attorney to assist in arguing the case. As previously indicated, prior to trial defense counsel made a series of motions concerning the procedure to be followed at trial, including a motion under section 1095 for the appointment of additional counsel to argue the case. In support of the motion, counsel asserted that "in view of the circumstances surrounding the case...without going into detail, I submit to this Court that such an appointment at this particular stage of an assistant to argue the death penalty phase of this particular case...would tend to follow the meaning and intent of the Legislature, pursuant to that section [1095], in a case such as this." Without submitting further argument in support of the motion, defense counsel urged that such additional counsel be appointed to sit during the entire trial, in order to become familiar with the case. The court denied the motion.

Defendant now contends that (1) section 1095 imposes upon the court a mandatory duty to appoint, on demand, additional counsel to argue the issues of a capital case, and (2) even if section 1095 is deemed discretionary rather than mandatory, the trial court under the circumstances here abused its discretion in denying defendant's motion. Neither contention has merit.

Section 1095, enacted in 1872, provides that "If the offense charged is punishable with death, two counsel on each side may argue the cause. In any other case, the court may, in its discretion, restrict the argument to one counsel on each side." It is readily apparent from the language of the section that it does not purport to authorize or mandate the *ap-*

*pointment* of additional counsel at public expense, but only to permit the *argument* of the case by two counsel. In referring to section 1095 the appellate court in *People* v. *Natale* (1962) 199 Cal.App.2d 153, 157 [18 Cal.Rptr. 491], observed, "The right guaranteed by this section is applicable only to a defendant who has retained more than one attorney as counsel in the case. It does not give the defendant in a capital case the right to have more than one counsel appointed to represent him, but merely allows a defendant who has retained multiple counsel the right to have at least two of them argue the case."

The correctness of the *Natale* holding is further confirmed by the fact that the subject of *appointment* of counsel appears in a separate title of the Penal Code, entitled "Pleadings and Proceedings *Before* Trial." (Italics added.) These sections (§§ 987-987.9) explain in detail the nature and extent of a defendant's right to appointed counsel, investigators and experts at public expense. It is significant that section 1095, on the other hand, is included within a subsequent title of the code denominated "Proceedings *After* the Commencement of the Trial and Before Judgment" (italics added) under a chapter designated "The Trial," which title deals with such matters as challenges to the jury (§ 1055 et seq.), the order of trial and instructions (§ 1093 et seq.) and similar procedural matters.

 Defendant contends, however, that regardless of legislative intent, equal protection principles compel an interpretation of section 1095 which will assure to every indigent defendant the absolute right to the appointment of an additional attorney to argue on his behalf at the penalty phase of a capital case. Underlying defendant's argument is the unsupported assumption that any advantage which is available to the wealthy defendant must, of constitutional necessity, be extended to an impecunious one, thus assuring equality of treatment. Equal protection principles, however, do not demand such practical parity. As we noted in *In re Antazo* (1970) 3 Cal.3d 100 [89 Cal.Rptr. 255, 473 P.2d 999], "the equal protection clause does not require 'Absolute equality' [citation], is not 'a demand that a statute necessarily apply equally to all persons' [citation] and permits a state to 'provide for differences so long as the result does not amount to…an "invidious discrimination."' [Citation.]" (P. 110.) The assistance of *additional* legal representation at the penalty phase argument is not a fundamental procedural right akin to the basic right to counsel (see *Gideon* v. *Wainwright* (1963) 372 U.S. 335, 340 [9 L.Ed.2d 799, 802-803, 83 S.Ct. 792, 93 A.L.R.2d 733]) or the right to a trial transcript (see *Grif-*

*fin* v. *Illinois* (1956) 351 U.S. 12, 19 [100 L.Ed. 891, 899, 76 S.Ct. 585, 55 A.L.R.2d 1055]). Accordingly, equal protection demands are satisfied by permitting the trial court, in its discretion, to appoint additional counsel at public expense if the circumstances in a particular case appear to require such an appointment. (See § 987.9, authorizing payment for "investigators, experts, and others for the preparation or presentation of the defense.")

■ Defendant alternatively contends, however, that the trial court abused its discretion in *summarily* denying his motion for additional counsel. He suggests that the trial court should have held a further hearing to determine whether or not the appointment of additional counsel would have been appropriate to assure defendant a fair trial. We cannot agree.

Defendant had ample opportunity to explain to the court any additional factors which supported his motion, but he failed to furnish any specific, compelling reasons in that regard. As explained above, counsel, "without going into any detail," merely relied upon "the circumstances surrounding the case." In an analogous situation involving a defendant's request to participate personally in arguments to the jury, we held that a defendant is required to make a "substantial showing" that, among other things, "the cause of justice will thereby be served." (*People* v. *Hill* (1969) 70 Cal.2d 678, 692-693 [76 Cal.Rptr. 225, 452 P.2d 329]; see also *People* v. *Marsden* (1970) 2 Cal.3d 118, 123 [84 Cal.Rptr. 156, 465 P.2d 44] [right to discharge counsel is not absolute but requires "a sufficient showing" of substantial impairment of the right to counsel].) Because defense counsel made no factual assertions which might have called for an additional hearing, the trial court was fully authorized to rule on the question based on counsel's argument alone. The case is thus distinguished from *Marsden*, wherein the trial court failed to afford defendant a fair opportunity to explain the factual basis for his claim of inadequate representation. (See also *People* v. *Lewis* (1978) 20 Cal.3d 496 [143 Cal.Rptr. 138, 573 P.2d 40]; cf., *Pierce* v. *United States* (D.C.App. 1979) 402 A.2d 1237.)

*Pierce, supra,* relied on by defendant, is similarly inapposite for in that case defense counsel candidly admitted that his lack of prior litigation experience might render his services inadequate and might necessitate additional legal assistance. In the present case, not only was no such admission made, but the trial court had full opportunity to observe counsel in the course of extensive argument on pretrial matters prior to

its ruling upon the present motion, and accordingly was well positioned to evaluate counsel's ability.

It should be noted that neither the facts nor the legal issues underlying the present case appear to have been so complex as to require the assistance of additional counsel as a matter of law. We conclude, accordingly, that the trial court acted properly and within its sound discretion in denying defendant's motion under section 1095.

## 2. *Adequacy of Trial Counsel*

Defendant's contention of ineffective trial representation is pointed at both the guilt and penalty phases of his trial. Defendant also has filed a habeas corpus petition alleging facts outside of the record which, assertedly, demonstrate such inadequacy. (See *People v. Frierson* (1979) 25 Cal.3d 142, 157-158 [158 Cal.Rptr. 281, 599 P.2d 587].) The People, having filed a return and a supplemental return to the order to show cause, and the parties having stipulated that the habeas corpus petition may be treated as a traverse, the issue is thus properly drawn. (See *In re Lawler* (1979) 23 Cal.3d 190, 194 [150 Cal.Rptr. 833, 588 P.2d 1257].)

a.) *The Guilt Phase.* ■ Defendant argues that his trial counsel failed to: (1) investigate the case in a proper and timely manner; (2) present a diminished capacity defense at trial; (3) object to certain adverse evidence; and (4) deny defendant's guilt during closing argument to the jury. We examine each contention.

Defendant complains that his counsel improperly delayed until the trial had already commenced before obtaining an investigator. Yet neither the record on appeal nor the habeas corpus petition affirmatively discloses either the need for such assistance or the precise extent of counsel's own pretrial investigative efforts. Thus we have no basis whatever for concluding that counsel failed to investigate either the facts or the law in the manner required of a reasonably competent, diligent and conscientious advocate. (*Frierson, supra,* 25 Cal.3d at p. 161; see *People v. Pope* (1979) 23 Cal.3d 412, 427 [152 Cal.Rptr. 732, 590 P.2d 859].) As appellate counsel readily concedes, "Appellant does not know if Mr. Veganes [trial counsel] did any investigation on his own." Appellate counsel speculates that trial counsel "*probably* did not interview any witnesses. . . ." (Italics added.) An assertion so speculative and con-

jectural cannot form the basis for a finding of counsel's incompetence on the ground of lack of investigation. Moreover, defendant's speculation is refuted by the record, which contains a form used by counsel in supporting his request for attorney's fees in which he stated that he had personally interviewed defendant, his relatives, several psychiatrists, the district attorney, other defense attorneys and experts, and a trial judge familiar with death penalty procedures.

Of more significance is the fact that, with one exception hereinafter discussed, defendant fails to specify what favorable evidence, if any, could have been obtained from any available witnesses. We have never required counsel to investigate all prospective witnesses (*People* v. *Floyd* (1970) 1 Cal.3d 694, 710 [83 Cal.Rptr. 608, 464 P.2d 64]) and we cannot presume prejudice from the mere fact of counsel's alleged inaction. ■ As we recently observed, in order to establish a successful claim of inadequate trial representation, defendant must prove "that counsel's acts or omissions resulted in the withdrawal of a potentially meritorious defense." (*People* v. *Pope, supra,* 23 Cal.3d 412, 425.) Further, defendant must "affirmatively show that the omissions of defense counsel involved a crucial issue, and that the omissions cannot be explained on the basis of any knowledgeable choice of tactics." (*Floyd, supra,* 1 Cal.3d at p. 709.)

■ In an effort to meet the foregoing *Pope* criteria, defendant has alleged in his habeas corpus petition that trial counsel failed specifically to investigate and present a potential diminished capacity defense based, in combination, upon defendant's supposedly low I.Q. and his use of marijuana on the day on which one of the burglary/murders occurred. Reduced to its essentials, the petition alleges in this regard that (1) defendant had told defense psychiatrists, prior to trial, that he had "smoked some grass" on the morning of the Ott burglary, (2) defendant's former counsel had suspected, prior to trial, that defendant lacked average intelligence, and counsel had planned to investigate the matter, and (3) according to a psychiatrist's recent opinion, persons of "lowered intelligence" may be more sensitive to the ingestion of marijuana from the standpoint of their "judgment and behavioral controls" than persons of normal intelligence.

Our examination of the petition, however, fails to reveal sufficient facts to establish even a prima facie case under the *Pope* standard. The petition does not affirmatively allege that *in fact* defendant has a low·

I.Q., or that he *actually* consumed marijuana on the day in question, or that the amount that he allegedly consumed was sufficient to affect, *or did in fact affect*, his mental capacity in some relevant manner. In short, defendant fails to state any facts from which we might determine whether or not a diminished capacity defense was indeed pertinent to his case, i.e., constituted a "potentially meritorious" defense. (See, e.g., *People* v. *Carr* (1972) 8 Cal.3d 287, 294-295 [104 Cal.Rptr. 705, 502 P.2d 513] [failure to prove amount of marijuana smoked or its effect on defendant].) In this regard, the present case differs markedly from the situation presented in *Frierson, supra*, 25 Cal.3d 142. There, defendant on appeal presented a similar claim of diminished capacity, based on trial testimony that defendant had taken "angel dust" and appeared "spaced out." The *Frierson* habeas corpus petition supplemented the appeal by describing in considerable detail both the facts underlying the defense and trial counsel's total failure to investigate or present it.

We have noted in the record a counterdeclaration by defendant's trial counsel asserting that his failure to pursue a diminished capacity defense was the result of a knowledgeable, *tactical* decision. According to counsel, defendant was examined by three psychiatrists, each of whom concluded that defendant's mental capacity was not diminished as a result of alcohol or drugs. Moreover, the psychiatric reports contained other unfavorable material, including "damaging" statements by defendant himself. Finally, trial counsel concluded that presentation of a diminished capacity defense based primarily upon the voluntary consumption of marijuana would have (1) required testimony from defendant personally, exposing him to intense and perhaps damaging cross-examination, and (2) provoked a "negative" reaction from the jurors. Significantly, the factual assertions in the foregoing declaration stand essentially uncontradicted by defendant.

Unlike *Frierson*, where counsel actually presented to the jury an "incomplete, undeveloped diminished capacity defense" (25 Cal.3d at p. 164), in the present case, trial counsel elected for tactical reasons to forego such a course. We cannot say that counsel's strategy under such circumstances was unreasonable. Defendant has failed to allege opposing facts which demonstrate affirmatively that counsel's decision was not merely tactical but, rather, resulted from incompetence or a failure reasonably to research the law or investigate the facts of the case. Accordingly, we are unable on this ground to conclude that trial counsel rendered inadequate representation. (*Floyd, supra*, 1 Cal.3d at p. 709.)

■ In addition, defendant argues that trial counsel failed vigorously to pursue formal pretrial discovery procedures which might have assisted defense efforts. Once again, neither the record nor the habeas petition supports a finding that, in this aspect of the case, counsel failed to act in a reasonably competent manner. Indeed, the record shows that trial counsel relied upon an "informal" discovery arrangement with the prosecutor which was approved by the trial court. Further, the record fails to disclose that the lack of any formal discovery procedures prejudiced defendant. The uncontradicted declaration by the prosecutor reveals that he gave to defense counsel copies of every document in his files months before trial. The prosecuting attorney supplemented this disclosure by delivering to defense counsel additional materials which thereafter surfaced. The declaration of defendant's trial counsel confirms that the prosecutor "fully complied" with the informal discovery arrangement. The only instance of possible delay in revealing evidence to defense counsel involved the statements of the witnesses Mikles and McFarland, defendant's cellmates. Although, as discussed below, the record indicates some delay in disclosing these statements, we conclude that defendant's interests could not have been adversely affected thereby. In response to defendant's claims of surprise, the trial court immediately granted him his requested continuance. Further, it promptly appointed an investigator to assist defense counsel in analyzing and impeaching the probable testimony of these witnesses. Finally, there is no suggestion of the manner in which the asserted failure of defendant's trial counsel to pursue formal pretrial discovery procedures resulted in the loss of any evidence which might have assisted in his defense.

■ Appellate counsel challenges the failure of defendant's trial counsel to object to the admission of certain evidence, including defendant's own tape-recorded statement to police officers, the testimony of the witnesses Mikles and McFarland, the testimony of Dr. Breton regarding the nature and extent of victim Ott's wounds, and the preliminary hearing testimony of the witnesses Rushing and Lewis. Contrary to this assertion, however, the record indicates that trial counsel did raise timely objection to much of the foregoing evidence. Furthermore, and of equal importance, as set forth in subsequent sections of this opinion, all of the evidence complained of was properly admissible at trial and objections would have been unavailing in any event. Any failure to object could not have amounted to that withdrawal of a potentially meritorious defense required to establish the inadequacy of counsel under our *Pope* standards. In addition, as we

have frequently observed, the failure to object to particular items of evidence is a matter which usually involves tactical decisions on counsel's part and seldom establishes counsel's incompetence. (*People v. Frierson, supra,* 25 Cal.3d 142, 158, and cases therein cited.) It has been aptly noted that "The indiscriminate use of objections, solely because they are available, aids neither the client nor the cause of justice...." (*People v. Thomas* (1974) 43 Cal.App.3d 862, 869 [118 Cal.Rptr. 226].) We cannot speculate on any tactical advantage that would have been gained by repeated and futile objections to the proffer of admissible evidence.

■ Appellate counsel criticizes trial counsel for alleged incompetence in failing to renew an earlier motion, subsequently withdrawn, to strike the special circumstances allegation based upon asserted arbitrary prosecutorial selection practices. Yet appellate counsel fails to discuss either the probable merits of the motion, or the chances of its success. Presumably the basis of the motion would have been the prosecutor's decision not to seek the death penalty for Elton Boyd, an accomplice of defendant during commission of the Curtis murder. Had such been its premise, the motion would have lacked merit, for defendant's multiple murders of two victims, both Curtis and Ott, would have constituted a reasonable basis under the circumstances for different prosecutorial treatment of defendant and Boyd. Indeed, defendant's conviction by a jury of those very multiple murders constituted a "special circumstance" permitting imposition of the death penalty in the present case. (Former § 190.2, subd. (c)(5).)

■ As another basis of claimed inadequacy it is urged that, by conceding defendant's complicity in the murders, trial counsel argued against his client during the closing argument portion of the guilt phase. We have reviewed the lengthy closing arguments, however, and find nothing improper or incompetent in counsel's argument. It must be recalled that defendant himself had admitted his involvement in both murders in conversations with various witnesses and that he introduced no evidence whatever which might have exonerated him. Nor does he attempt at this time to suggest what testimony from what witnesses might have been presented to aid him. Accordingly, it is entirely understandable that trial counsel, given the weight of incriminating evidence, made no sweeping declarations of his client's innocence but instead adopted a more realistic approach, namely, that although defendant and others may have committed both burglaries, and may have aided

and abetted the acts of violence which caused the victims' deaths, nonetheless any such acts were unpremeditated and lacked the requisite deliberation or intent to kill. As stated in a recent case, "good trial tactics demanded complete candor" with the jury. (*People v. Powell* (1974) 40 Cal.App.3d 107, 167 [115 Cal.Rptr. 109].) Under the circumstances we cannot equate such candor with incompetence.

Thus, defense counsel in closing argument reviewed some of the evidence against his client, and emphasized various defects and gaps in the evidence and in the prosecutor's theory of deliberate, premeditated murder. He strongly urged the jurors to decline to find any special circumstances which would have permitted imposition of the death penalty. Defense counsel stressed such matters as the monetary motive for the entries; the lack of fingerprints on the wine bottle assertedly used on the victim Ott; the general unreliability of the testimony of the various prosecution witnesses; defendant's constitutional right to decline to testify on his own behalf; and his cooperation in surrendering to the officers when he learned they were seeking him. The defense argument comprises 48 pages of transcript. In contending that trial counsel's presentation prejudiced defendant, his appellate counsel focuses upon only a few brief passages. We conclude that counsel's argument was reasonably competent considered in the light of the overwhelming evidence of defendant's guilt.

b.) *The Penalty Phase.* ■■■ Defendant's primary contention regarding trial counsel's inadequacy at the penalty phase is that counsel failed to present any mitigating evidence which might have led the jury to conclude that the death penalty should not be imposed. Yet, unlike *People v. Frierson, supra,* 25 Cal.3d 142, 164-166, wherein a similar theme was successfully advanced, defendant has failed to demonstrate (by his petition for habeas corpus or otherwise) what mitigating evidence, if any, beyond his youth and voluntary surrender, was available to counsel. ■■■ As explained below, trial counsel argued at length in an attempt to persuade the jury to render a more lenient verdict, making frequent references to the evidence adduced during the guilt phase and to possibly mitigating factors such as defendant's age and his cooperation with the police. Under the circumstances, we find no basis for concluding that trial counsel afforded defendant inadequate representation at the penalty phase.

In *Frierson, supra,* we observed that defendant had submitted declarations from various witnesses, including friends, relatives and

acquaintances of defendant "containing material which conceivably might have mitigated his conduct." (P. 165.) Although we recognized the risk of "second-guessing" trial counsel after the event, we further noted that trial counsel's exercise of discretion in the area of trial tactics "must be a reasonable and informed one in the light of the facts and options reasonably apparent to counsel at the time of trial, and founded upon reasonable investigation and preparation." (P. 166.)

We concluded in *Frierson* that counsel afforded inadequate representation at both the guilt and penalty phases. We distinguished *People* v. *Durham* (1969) 70 Cal.2d 171, 191-192 [74 Cal.Rptr. 262, 449 P.2d 198], an opinion which contains principles of particular application to the case before us. In *Durham*, speaking through Justice Sullivan, we rejected the contention that defense counsel was incompetent in failing to call any witnesses at the penalty phase of a capital case, reasoning as follows: "It is suggested that there must have been *some* available evidence in mitigation of penalty which might have been produced in his behalf, and that the failure to produce *any* such evidence resulted in constitutional infirmity. [Italics in original.]

"*We do not accept this suggestion.* Allegations of representation so inadequate as to amount to constitutional defect must be supported by more than speculative arguments. [Citation.] *Defendant has pointed to no specific evidence in mitigation which might have been presented in his behalf; he has named no witnesses who, if called in his behalf, would have testified favorably to him on penalty issues.* On the other hand, it appears that counsel presented to the penalty jury a well-reasoned argument in defendant's behalf . . . and generally appealed to the mercy of the jury in a persuasive manner. It further appears . . . that counsel . . . decided against [calling defendant to testify] . . . after a careful consideration as to the scope of cross-examination . . . . Finally, counsel subjected each witness presented by the prosecution at the penalty phase to cross-examination. In view of the totality of circumstances we cannot conclude that the representation afforded defendant at the penalty phase herein resulted in a denial of his right to the effective aid of counsel in that proceeding." (P. 192, italics added; see also *People* v. *Hill, supra*, 70 Cal.2d 678, 690-691 [to establish inadequacy of counsel, defendant must specify which witnesses counsel failed to call and must establish the materiality of their testimony].)

The present case is indistinguishable from *Durham*. ▮ As in *Durham*, defendant herein has pointed to no witnesses who might have

offered mitigating testimony. Justice Mosk's dissenting opinion suggests that defense counsel should have called defendant's grandmother, Mattie Jackson, to the witness stand, and that he was incompetent in failing to do so. The record, however, indicates that Mrs. Jackson was nearly 90 years old and, in defense counsel's opinion, was "senile." Counsel, realizing that he had found no effective witnesses to appear on defendant's behalf at the penalty phase, carefully explored the possibility of calling Mrs. Jackson but, after weighing the pros and cons, ultimately decided against doing so. His decision, literally and inherently teeming with tactical considerations, is one which *any* reasonable, competent, and diligent counsel might have made. Under the circumstances of this case, that decision required a careful balancing by counsel of numerous factors, including (1) the ability of the witness to express herself in coherent fashion, (2) the content of her testimony, and (3) the probable effect and impact of her testimony upon the jury. Counsel might very well have determined that Mrs. Jackson, by reason of advanced age and demonstrated inability to communicate in a rational manner (and her unshaken belief that defendant was innocent despite the overwhelming case against him) would not assist defendant at the penalty phase, and that the jurors indeed might react negatively to her testimony. ▮ With due respect to our dissenting colleagues, under the *Durham* rationale "[I]n view of the totality of circumstances we cannot conclude that the representation afforded defendant at the penalty phase herein resulted in a denial of his right to the effective aid of counsel in that proceeding." (70 Cal.2d at p. 192.)

In addition, as in *Durham*, trial counsel herein presented to the penalty jury a reasonable closing argument based primarily upon a theme which stressed the following factors: defendant's age (he was 19 years old when he committed the offenses), his cooperation with the police, the value of all human life, the responsibility of our capitalistic society for "creating" persons such as defendant, and the need for the exercise of mercy in order to alleviate both social and racial tensions.

Furthermore, as in *Durham*, trial counsel in advancing his client's interests at the penalty phase, took reasonable additional measures such as cross-examination of prosecution witnesses, objection to prosecution evidence and proposed instructions, and submission of favorable "special circumstances" instructions. Finally, following the jury's verdict, counsel continued his defense efforts, filing motions for new trial, for arrest of judgment, and for modification of verdict, based on a wide variety of grounds.

Trial counsel's declaration on file herein discloses that he has had 13 years prior experience in the practice of criminal law, including murder trial participations, and that he frequently consulted with judges and other lawyers regarding the trial of a capital case and took educational courses on that subject. As recently expressed, "Defendants have an arsenal of weapons available to them before and during trial for a meaningful defense. [Citation.] Mental straitjackets should not be placed on thoughtful defense counsel who wish to selectively choose which weapon is best for a defendant or which type of advocacy . . . is best designed to reach what they believe is a satisfactory result for their client." (*People* v. *Espinoza* (1979) 99 Cal.App.3d 44, 48 [159 Cal. Rptr. 803].)

■■ Defendant's final challenge to his trial counsel's competence is based on counsel's failure to present to the jury as a mitigating circumstance the fact (if indeed it was a fact) that defendant had consumed some marijuana on the day of the Ott burglary/murder. (See former § 190.3, subds. (c), (g), (j).) As we have previously noted, neither the record on appeal nor the habeas corpus petition filed by defendant herein contains sufficient factual support for this theory. Moreover, as indicated above, defendant has failed to establish affirmatively that his counsel's omission "cannot be explained on the basis of any knowledgeable choice of tactics." (*People* v. *Floyd, supra,* 1 Cal.3d 694, 709.) Trial counsel's declaration discloses that, as in *Durham,* he determined to withhold from the jurors any defense or theory of mitigation based on voluntary consumption of marijuana, because such a defense would have required defendant to testify and to face cross-examination with probable damaging consequences. (According to counsel, in his declaration, the prosecution possessed rebuttal evidence disclosing "vicious attacks" by defendant upon other persons.) Counsel further hoped that the jury would decline to impose the death penalty in view of its "limited knowledge" of defendant and his particular role in the offenses.

■■ Based on the totality of circumstances, we conclude that counsel's representation of defendant at the penalty phase did not result in a denial of defendant's right to the effective aid of counsel. We further conclude that defendant's petition for habeas corpus must be denied for failing to allege sufficient additional facts which either would demonstrate counsel's incompetence or warrant an evidentiary hearing in the matter.

### 3. *Admissibility of Defendant's Statement to Police Officers*

At trial the People were permitted, over defendant's objection, to introduce a tape-recorded statement given by defendant to police officers during a custodial interrogation. In the statement, defendant admitted his complicity in the Curtis and Ott murders. ▉ Defendant contends that the statement was inadmissible because (1) the officers represented to defendant that the statement would not be used for court purposes; (2) the officers promised defendant leniency in order to induce him to confess; and (3) the officers continued their interrogation after defendant had invoked his right to remain silent. None of these contentions has merit.

a.) *Alleged Deceit.* The tape-recorded statement contains some preliminary discussion between Officers Bohnlein and Kavenaugh regarding the future use of the statement. Contrary to defendant's present assertion, however, the record fails to suggest any deception whatever by these officers. Thus, according to the record, after the officers had recited the date and time of the interrogation, the following conversation ensued:

"BOHNLEIN: Are you gonna use that?

"KAVENAUGH: Yeah, that's all.

"BOHNLEIN: Then are we gonna use it from, for court purposes?

"KAVENAUGH: I don't know.

"BOHNLEIN: Then we just . . .

"KAVENAUGH: Just so we don't forget anything.

"BOHNLEIN: Do you mind if these statements are taped?

"JACKSON: Uh, no."

Officer Kavenaugh testified regarding the foregoing conversation in the course of a pretrial hearing conducted for the purpose of establishing the voluntariness of defendant's statement. According to Kavenaugh, the interrogating officers frequently use a tape recorder to assure that none of the contents of an interrogation is lost or forgotten.

The discussion recited above related to "whether we were going to use the tape for court, or whether we were going to use it to refresh our memories when we dictate our reports." The quoted excerpt indicates that the officers discussed possible uses of the recording. They made no statement or assurance to the effect that the recording would not be used for court purposes.

We think it significant that, although defendant himself testified at the pretrial hearing regarding the circumstances surrounding the recording of his statement, he did not assert that he was deceived or misled regarding the court use thereof. Indeed, prior to the conversation at issue, the officers had carefully advised defendant, among other things, that anything he told them "could be used against him in court."

The present case, therefore, is clearly distinguishable from *People* v. *Braeseke* (1979) 25 Cal.3d 691, 702-703 [159 Cal.Rptr. 684, 602 P.2d 384], wherein the officers elicited defendant's confession after apparently acceding to defendant's request for an "off the record" interview. Here, the record affords no basis whatever to support defendant's present contention that the officers made "false and misleading statements" regarding the ultimate use of defendant's statement. Nor does the record disclose any "clever softening-up" conversations of the type which we condemned in *People* v. *Honeycutt* (1977) 20 Cal.3d 150, 160 [141 Cal.Rptr. 698, 570 P.2d 1050]. We conclude, accordingly, that defendant's statement was not rendered either involuntary or inadmissible by reason of the interrogating officers' brief reference to the possible future uses of that statement.

b.) ▇▇▇ *Alleged Promise of Leniency.* The transcript of defendant's statement discloses that at one point during the interrogation, following defendant's assertion that he "didn't do it" (referring to the burglary and murder of Mrs. Curtis), Officer Kavenaugh stated "If you did, you are going to feel better if you tell us." Later in the interrogation, Officer Wren asked defendant if he could point out the house where some of the stolen property was taken and Officer Collette stated "We wouldn't let anybody see you. You are cooperating with us. You are helping yourself and you are helping us to get this... cleared up. If we take you out there at night, hide you so nobody could see, you could point it out and get all the stuff back that was taken out of the place."

Defendant contends that the foregoing remarks constituted improper promises of leniency or other benefits which rendered his statement in-

voluntary. (See, e.g., *People* v. *Jiminez* (1978) 21 Cal.3d 595, 611 [147 Cal.Rptr. 172, 580 P.2d 672]; *People* v. *McClary* (1977) 20 Cal.3d 218, 228-229 [142 Cal.Rptr. 163, 571 P.2d 620].) We do not agree.

█ As we explained in *McClary,* "In *Hill* [*People* v. *Hill* (1967) 66 Cal.2d 536 (58 Cal.Rptr. 340, 426 P.2d 908)], we observed a line between mere police exhortation urging the suspect to talk to them, on the one hand, and express or implied offers of leniency, on the other; we explained that the distinction 'does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police.' (P. 549.) We noted that 'When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct,' the subsequent statement will not be considered involuntarily made. (*Ibid.*) On the other hand, 'if. . .the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible. The offer or promise of such benefit need not be expressed, but may be implied from equivocal language not otherwise made clear. [Citations.]' (*Ibid.*; see also *People* v. *Nelson* (1964) 224 Cal.App.2d 238, 250-251 [36 Cal.Rptr. 385].)" (20 Cal.3d at p. 228.)

█ In the present case, it cannot reasonably be said that Officer Kavenaugh's statement that defendant would "feel better" if he confessed constituted any promise of benefit other than the psychological benefit which "flows naturally from a truthful and honest course of conduct" (*Hill, supra,* 66 Cal.2d at p. 549). It is also noteworthy that defendant himself expressly acknowledged at the conclusion of his statement that no tangible or official benefits were promised him.

Similarly, Officer Collette's statement that defendant would be helping himself by cooperating with the officers was not made to induce any statement or confession, but occurred in the context of a request that defendant escort the officers to the location of the stolen property. Significantly, this request was made *after* defendant had already admitted his complicity in the Ott burglary and murder.

Furthermore, our previous holdings support the conclusion that the foregoing remark would not have constituted an improper promise or inducement even had it been made for the purpose of eliciting a state-

ment. As we noted in *People* v. *Ditson* (1962) 57 Cal.2d 415, 433 [20 Cal.Rptr. 165, 369 P.2d 714], "we find no suggestion of threats or promises. We do find searching questions *and exhortations to help himself* by revealing the acts of others. But absent something other than mere questions, or exhortations to tell the truth or clear his conscience *or help himself by revealing facts . . .*, there appears to be nothing on the face of the record which would support a finding of overreaching or coercion." (P. 433, italics added; accord, *People* v. *Hill, supra*, 66 Cal.2d 536, 548-549 [officers urged defendant to "help himself"].) In similar fashion, we conclude that the officers' remarks to defendant did not render his statement involuntary.

c.) ▄▄▄ *Alleged Miranda Violation.* Defendant next argues that the officers improperly interrogated him despite the invocation of his constitutional right to remain silent and to consult an attorney. The record discloses that, prior to interrogating defendant, Officer Bohnlein carefully explained to defendant his various rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], and then inquired "Having those rights in mind, do you want to talk to us regarding these allegations?" According to the transcript of the tape recording, defendant replied "No. I want to talk to—yes— (Inaudible)." Thereupon, the interrogation proceeded without further objection by defendant.

Defendant argues that his response to Officer Bohnlein was an assertion of his right to remain silent, thereby rendering all subsequent statements inadmissible. It is well settled that once a suspect indicates his refusal to waive his constitutional rights, all further, interrogation must cease. (*People* v. *Braeseke, supra*, 25 Cal.3d 691, 702; *People* v. *Pettingill* (1978) 21 Cal.3d 231, 237-241 [145 Cal.Rptr. 861, 578 P.2d 108]; *People* v. *McClary, supra*, 20 Cal.3d 218, 226.) Further, the record must contain evidence from which the trial court could have found beyond a reasonable doubt that the statement at issue was the product of a knowing and intelligent waiver of defendant's *Miranda* rights. (*People* v. *Braeseke, supra*, 25 Cal.3d at p. 701; see *People* v. *Jiminez, supra*, 21 Cal.3d 595, 608.) On the other hand, as a reviewing court, we must examine the uncontradicted facts in the record to determine independently whether the trial court's finding of intelligent waiver was properly made. As to conflicting testimony, we must accept that version of events which is most favorable to the People, to the extent that it is supported by the record. (See *People* v. *Jiminez, supra*, at p. 609.)

Defendant unsuccessfully litigated the question of his waiver of constitutional rights at two separate stages of these proceedings. First, at a pretrial hearing on defendant's motion to exclude his statement (Evid. Code, § 402), the interrogating officers testified that defendant had responded affirmatively to their request to talk with him. According to Officer Kavenaugh, "he wanted to talk to us, it [defendant's response] was not a 'no.'" Further, Kavenaugh testified that defendant said nothing to indicate he wanted to talk to an attorney. Officer Bohnlein confirmed that defendant never requested to talk to an attorney. Defendant was called to testify on the matter, and he claimed that he told the officers that "I wanted to talk to a lawyer," and that Officer Kavenaugh agreed to obtain a lawyer for defendant.

To assist in resolving the foregoing conflicting testimony, a police sound-laboratory expert examined the tape recording and testified that in his opinion the transcription was accurate and that defendant's response had been "No, I want to talk to—yes," without more than a second's pause between the word "yes" and the rest of the sentence. The witness concluded that defendant's response could not have included a request for an attorney because "There is not enough time between the words 'to' and 'yes.'"

Based upon its evaluation of all of the foregoing testimony, the trial court denied defendant's motion, stating that "I am satisfied beyond a reasonable doubt and the mechanics of the production of this tape eliminated any possibility of, after the word 'to,' the defendant saying lawyer, attorney, P.D. or anything else."

Thereafter, at trial, defendant renewed his objection to the tape recording, and additional testimony was elicited outside the presence of the jury. Officer Bohnlein stated that when defendant was asked if he wished to talk to the officers, he initially stated "No," but then agreed to discuss the matter. At no time, according to Bohnlein, did defendant ask to talk to an attorney. Defendant, on the other hand, testified that his response to Bohnlein's inquiry was "No, I want to talk to a— to a—to a Public Defender." Subsequently, defendant changed that testimony, stating that although he attempted to request an attorney, "I never did finish my sentence, whatever I said."

At the conclusion of the foregoing hearing, the trial court expressly found "beyond a reasonable doubt" that defendant was advised of his

constitutional rights and that he made a knowing and intelligent waiver of those rights.

As indicated by the summarized testimony, there was ample evidence to support the trial court's ruling. Defendant's initial assertion that he had requested an attorney was contradicted by the interrogating officers and the police sound technician. The plain inference from the record is that defendant declined to talk with the officers and then, in the same breath, changed his mind and agreed to do so. Although defendant now contends that all interrogation should have ceased once defendant invoked his rights by stating "No" in response to the officer's inquiry, it is well settled that "A suspect who has asserted his rights and prevented further lawful interrogation nonetheless retains the option, thereafter, *voluntarily* to initiate a confession.' [Citations.]" (*People v. McClary, supra,* 20 Cal.3d at p. 226, italics in original.) In the present case, although defendant may have fleetingly invoked his *Miranda* rights, he immediately agreed to waive those rights without the intervention of any urging or interrogation by the officers. The record discloses no cajoling or badgering by the police. Rather, the decision to talk appears to have been the free, voluntary decision of defendant. Accordingly, we conclude that the trial court did not err in admitting defendant's statement into evidence.

### 4. ▉ Admissibility of Photograph of Victim Curtis

Defendant urges that the trial court, during the guilt phase, erred in admitting a color photograph of the face of Mrs. Curtis, disclosing multiple bruises. We have said recently that "Evidence Code section 352 vests the court with broad discretion to weigh the prejudicial effect of proffered evidence against its probative value. [Citation.] No abuse of that discretion appears: the photograph was not cumulative, *and was highly relevant evidence on the issue of malice. . . .* '[M]urder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant . . . .'" (*People v. Pierce* (1979) 24 Cal.3d 199, 211 [155 Cal.Rptr. 657, 595 P.2d 91], italics added; see *People v. Cruz* (1980) 26 Cal.3d 233 [162 Cal.Rptr. 1, 605 P.2d 830]; *People v. Frierson, supra,* 25 Cal.3d at p. 171.)

Defendant had been charged with first degree murder of Mrs. Curtis with malice aforethought; the jury was instructed on the alternative theories of premeditated murder and felony murder. Accordingly, as in *Pierce,* the photograph in question bore on the issue of defendant's req-

uisite state of mind toward Mrs. Curtis, i.e., did he possess malice? This fact distinguishes *People* v. *Boyd* (1979) 95 Cal.App.3d 577, 589-590 [157 Cal.Rptr. 293], a case which also involved the Curtis murder. In *Boyd*, the accomplice of defendant was tried under a felony-murder theory only; two color photographs of the victim were introduced. The Court of Appeal held that the trial court erred in admitting these photographs because "It cannot be said...that the photographs had any degree of relevancy on issues such as intent, malice or the degree of the offense since, under the prosecution's theory, defendant was guilty of first degree murder by virtue of the felony-murder doctrine." (P. 589.)

Although the photograph which was admitted is unpleasant to view, we conclude that the trial court did not err in admitting it. In addition, it is noteworthy that the *Boyd* court held that any error in admitting the foregoing photographs was harmless in view of the "overwhelming" evidence of Boyd's guilt. In our view the evidence of defendant's guilt in the matter before us may be similarly characterized.

5. ▆▆▆ *Admissibility of Evidence of Victim Ott's Injuries*

At the guilt phase, the prosecution, outside the presence of the jury, offered to prove that the investigating officers had discovered a single human hair (possibly a pubic hair) on the neck of a wine bottle found on the floor near victim Ott's body. The prosecution further offered to prove that the officers also observed an injury or abrasion near the victim's private parts. Defendant objected to the proposed testimony as unduly prejudicial (see Evid. Code, § 352) and the trial court sustained the objection. (The evidence was subsequently introduced at the penalty phase.)

Thereafter, Doctor Breton, the autopsy surgeon, testified that in addition to Mrs. Ott's various injuries and bruises, her vagina had been torn or lacerated, and that in his opinion the injury could have been caused by a foreign object such as a bottle. Furthermore, the prosecution elicited from defendant's jail cellmates, Mikles and McFarland, that defendant had boasted of his sexual assault with a bottle on one of the victims.

Defendant contends that the admission of the foregoing testimony was improper because of its "overwhelming prejudicial nature." To the contrary, the trial court acted well within its discretion under Evidence Code section 352. The court properly rejected evidence of the hair on

the bottle as unduly prejudicial in the light of its speculative nature. Trial courts, vested with broad discretion under this section, frequently sustain many objections to real or demonstrative evidence on the ground that its gruesome or shocking nature may unduly prejudice a defendant in the eyes of the jury. (E.g., *People v. Love* (1960) 53 Cal.2d 843, 856-857 [3 Cal.Rptr. 665, 350 P.2d 705]; *People v. Cavanaugh* (1955) 44 Cal.2d 252, 267-268 [282 P.2d 53].) On the other hand, expert testimony regarding the extent of a victim's injuries and the means used to inflict such injuries, is generally held admissible. (*People v. Jackson* (1971) 18 Cal.App.3d 504, 507 [95 Cal.Rptr. 919]; *People v. Sampo* (1911) 17 Cal.App. 135, 150 [118 P. 957]; see 1 Wharton, Criminal Evidence (13th ed. 1972) § 183, pp. 344-347.) Such evidence is often relevant on the issues of malice and intent. (See *People v. Pierce, supra*, 24 Cal.3d 199, 211.)

Furthermore, the testimony of defendant's cellmates regarding defendant's admission was relevant to establish that it was defendant, not his accomplice Boyd, who committed the sexual assault on victim Ott. We conclude that the trial court did not err in admitting the foregoing evidence.

### 6. *Prosecutorial Misconduct*

Defendant next contends that the prosecutor improperly commented upon defendant's refusal to testify in his own behalf. (See *Griffin v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229].) The record reveals that during the guilt phase of the trial, defense counsel asked the prosecutor to stipulate that defendant was 19 years old at the time of his arrest. The prosecutor refused, stating in the presence of the jury "I will not [so stipulate]. I have no information of that [defendant's age] unless the defendant takes the stand and wishes to so testify." The trial court thereafter stated "All right. There is no stipulation forthcoming," and the matter was dropped.

*Griffin* forbids either direct or indirect comment upon the failure of the defendant to take the witness stand. The rule, however, does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses. (*People v. Vargas* (1973) 9 Cal.3d 470, 475 [108 Cal.Rptr. 15, 509 P.2d 959].) We need not decide whether the prosecutor's statement falls within the foregoing exception, or, alternatively, is an indirect reference to the fact that defendant had not previously testified, and thus is com-

parable to observing that defendant has not personally denied or refuted certain evidence, or that defendant is in the "best position" to explain certain facts, all of which have been held to be *Griffin* error. (See *id.*, at p. 476 and cases cited.)

The controlling fact is, as we made explicit in *Vargas*, that such indirect, brief and mild references to defendant's failure to testify, without any suggestion whatever that an inference of guilt should be drawn therefrom, are uniformly held to constitute harmless error. (*Id.*, at pp. 478-481.) We accordingly conclude that, on the basis of the record before us, the remark at issue could have had no significant impact upon the jury and was harmless beyond a reasonable doubt.

7. ■ *Necessity for Manslaughter Instructions*

Defendant argues that the trial court erred in refusing to instruct the jury on the principles of voluntary manslaughter (§ 192). Our review of the record herein discloses, however, that there was no substantial evidence deserving of consideration which might have led reasonable jurors to reach a verdict of voluntary manslaughter. (See *People v. Flannel* (1979) 25 Cal.3d 668, 684 [160 Cal.Rptr. 84, 603 P.2d 1].)

Voluntary manslaughter is statutorily defined as the unlawful killing of a human being without malice upon a sudden quarrel or heat of passion. (§ 192, subd. 1.) As we recently observed, "If a killing, even though intentional, is shown to have been committed in a heat of passion upon sufficient provocation the absence of malice is presumed. [Citation.] . . . [¶] Because the existence of malice is presumed when the circumstances of a killing suggest an intent to kill . . . provocation *and* heat of passion must be affirmatively demonstrated. [Citations.]" (*People v. Sedeno* (1974) 10 Cal.3d 703, 719 [112 Cal.Rptr. 1, 518 P.2d 913], italics in original.)

"Heat of passion" has been defined as "'such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances . . . .'" (*People v. Berry* (1976) 18 Cal.3d 509, 515 [134 Cal.Rptr. 415, 556 P.2d 777], quoting from an earlier case.) As for the element of provocation, "there is no specific type of provocation required by section 192 and . . . verbal provocation may be sufficient. [Citation.]" (*Ibid.*) In *Berry*, for example, we held that the provocative conduct by defendant's wife which could arouse a

passion of jealousy, pain and sexual rage in "a man of average disposition" was sufficient to require instructions on voluntary manslaughter.

In the present case, the record indicates that defendant may have become enraged and brutally attacked and killed one of his elderly victims because she awakened during the burglary and began to scream. No case has ever suggested, however, that such predictable conduct by a resisting victim would constitute the kind of provocation sufficient to reduce a murder charge to voluntary manslaughter. (See, e.g., *People* v. *Morse* (1969) 70 Cal.2d 711, 734-735 [76 Cal.Rptr. 391, 452 P.2d 607].) We noted in *People* v. *Flannel, supra,* that if the evidence which supports a manslaughter theory is "minimal and insubstantial," the trial court need not instruct on that theory. (25 Cal.3d at pp. 684-685.)

We conclude that defendant presented no substantial evidence that he killed either of his victims in a heat of passion on sufficient provocation. Because of this conclusion, we need not resolve the further question whether the failure to give a manslaughter instruction was harmless error under the test announced in *People* v. *Sedeno, supra,* 10 Cal.3d 703, 721.

## 8. *Admissibility of Accomplice's Statement*

■ Defendant urges that the trial court erred in permitting the witness Gaines to testify concerning remarks made to her by the accomplice Boyd which assertedly implicated defendant. Gaines testified in effect that Boyd had denied complicity in the Curtis murder and had asked Gaines to inquire of defendant why defendant had "involved" Boyd in the murder. Gaines also testified that Boyd told her he knew the person who had killed Curtis. The court at this point terminated any further inquiry on the subject.

Under defendant's theory, because Boyd was not present at trial as a witness and was therefore unavailable for cross-examination, the admission of his remarks violated defendant's right to confront adverse witnesses. (See *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620]; *People* v. *Aranda* (1965) 63 Cal.2d 518, 530-531 [47 Cal.Rptr. 353, 407 P.2d 265].) The *Bruton* and *Aranda* rules concern the admissibility of a codefendant's statements during the conduct of a joint trial. In the present case, defendant was tried separately from Boyd. Accordingly, a more applicable legal principle is the hearsay rule, which (in the absence of an exception to the rule) renders

inadmissible a statement "made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200; see *People* v. *Preston* (1973) 9 Cal.3d 308, 313-316 [107 Cal.Rptr. 300, 508 P.2d 300]; *People* v. *Simmons* (1946) 28 Cal.2d 699, 712 [172 P.2d 18].)

We find it unnecessary, however, to determine whether the testimony of the witness Gaines was admissible under some exception to the hearsay rule for, closely examined, her testimony regarding Boyd's statements was innocuous and did not implicate defendant.

The evidence of defendant's involvement in the Curtis murder was overwhelming. It included defendant's own admissions to Gaines, Debria Lewis, Debra Hall, cellmates Mikles and McFarland, and the interrogating officers. Under the circumstances, it is not reasonably probable that the jury would have reached a more favorable verdict but for the admission of the foregoing testimony from the witness Gaines. Accordingly, any error in admitting it was clearly harmless. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836-837 [299 P.2d 243]; see also *Parker* v. *Randolph* (1979) 442 U.S. 62 [60 L.Ed.2d 713, 99 S.Ct. 2132] [opns. of Renquist and Blackmun, JJ.].)

9. *Delay in Disclosing Prosecution Witness*

■ Defendant asserts that the prosecutor unduly delayed the delivery to defense counsel of information regarding the probable testimony of defendant's cellmate Mark Mikles concerning defendant's admissions to him. The record reflects that Mikles' name was added to the prosecutor's witness list shortly before trial commenced. When defense counsel learned that Mikles would be called, he complained to the trial court that he had been given insufficient notice that the witness would be called. In response the trial court granted a brief continuance and appointed an investigator to assist defense counsel in preparing his defense to Mikles' testimony. In addition, the prosecutor offered to permit counsel to interview Mikles. Finally, defense counsel obtained a full preview of Mikles' testimony during a special foundational hearing (Evid. Code, § 402) conducted prior to Mikles' appearance on the witness stand.

The grant or denial of continuances for discovery purposes is a matter peculiarly within the discretion of the trial court (*People* v. *Duck Wong* (1976) 18 Cal.3d 178, 188-189 [133 Cal.Rptr. 511, 555 P.2d

297]) and defendant must demonstrate some resulting prejudice from the denial of a continuance (*People* v. *Laursen* (1972) 8 Cal.3d 192, 204 [104 Cal.Rptr. 425, 501 P.2d 1145]). In the present case, a continuance was granted, and defendant fails to indicate in what manner the relief obtained by him was insufficient to protect his interests as it related to Mikles' testimony.

Defendant suggests that the prosecutor acted improperly in failing to furnish to defense counsel, prior to trial, copies of all documents or reports summarizing the evidence to be offered at trial. Although we have held that the People must furnish, *sua sponte*, any evidence *favorable* to defendant (see *People* v. *Nation* (1980) 26 Cal.3d 169, 175 [161 Cal.Rptr. 299, 604 P.2d 1051]; *People* v. *Ruthford* (1975) 14 Cal.3d 399, 406 [121 Cal.Rptr. 261, 534 P.2d 1341]; *In re Ferguson* (1971) 5 Cal.3d 525, 533 [96 Cal.Rptr. 594, 487 P.2d 1234]), we have never required pretrial disclosure of unfavorable evidence, at least in the absence of a proper request therefor. We accordingly conclude that, no prejudice being shown, defendant's present contention of untimely or inadequate evidentiary disclosure is untenable.

## 10. *Defendant's Absence from Mistrial Hearing*

Defendant contends that he was improperly deprived of his constitutional and statutory right to be present personally at all trial proceedings. (See Cal. Const., art. I, § 15; Pen. Code, §§ 977, 1043.) He focuses, in this connection, on a proceeding during trial when, after the admission of cellmate Mikles' testimony, defense counsel moved for a mistrial because of the prosecutor's delay in disclosing the nature of Mikles' testimony as it pertained to defendant's involvement in the murders. Also at issue at this point was the question whether the prosecutor had suppressed or destroyed a tape recording of Mikles' statement.

The motion for mistrial was made in the court's chambers outside the presence of the jury. The court noted for the record that defendant was not personally present and defense counsel expressly waived his client's attendance at the hearing. Thereupon, the prosecutor explained that the Mikles tape recording evidently had been inadvertently misplaced, and he described the circumstances underlying that matter. Defense counsel, acknowledging the prosecutor's prior "honesty and credibility," accepted the prosecutor's explanation, but argued that in the absence of sufficient prior notice of Mikles' probable testimony, he had been unable competently to impeach Mikles.

The prosecutor responded by pointing out that he had included Mikles' name on a witness list furnished to defense counsel shortly before trial, and that it was defense counsel's own responsibility to ascertain the witness' probable testimony and to prepare to impeach it. The prosecutor also observed that Mikles' prior criminal record adequately served to impeach that witness. In addition, both of the officers who originally interviewed Mikles had been available for interview by defense counsel.

The trial court, in denying defendant's motion for mistrial, ruled that because defense counsel had notice "early on in the trial" of the likelihood that Mikles would testify, it was counsel's responsibility to perform any investigative work necessary for impeaching that witness. The court further accepted the prosecutor's explanation regarding the missing tape recording.

Defendant now contends that it was reversible error to hold the mistrial hearing outside his presence. The point lacks merit. Section 977, subdivision (b), provides in pertinent part that in felony cases "the accused must be present at the arraignment, at the time of plea, during the preliminary hearing, during those portions of the trial when evidence is taken before the trier of fact, and at the time of the imposition of sentence. The accused shall be personally present at all other proceedings unless he shall, with leave of court, execute in open court, a written waiver. . . ." Furthermore, section 1043, subdivision (a), recites in part that "Except as otherwise provided in this section, the defendant in a felony case shall be personally present at the trial."

The cases which have interpreted the foregoing sections uniformly have held that the accused is not entitled to be personally present either in chambers or at bench discussions which occur outside of the jury's presence on questions of law or other matters in which defendant's presence does not bear a "'reasonably substantial relation to the fullness of his opportunity to defend against the charge.'" (*In re Lessard* (1965) 62 Cal.2d 497, 506 [42 Cal.Rptr. 583, 399 P.2d 39]; accord *In re Dennis* (1959) 51 Cal.2d 666, 672 [335 P.2d 657]; *People* v. *Abbott* (1956) 47 Cal.2d 362, 372 [303 P.2d 730]; *People* v. *Isby* (1947) 30 Cal.2d 879, 894 [186 P.2d 405]; see *People* v. *House* (1970) 12 Cal.App.3d 756, 766-767 [90 Cal.Rptr. 831]; *People* v. *Boehm* (1969) 270 Cal.App.2d 13, 19-20 [75 Cal.Rptr. 590]; *People* v. *Teitelbaum* (1958) 163 Cal. App.2d 184, 207 [329 P.2d 157]; see 3 Wharton, Criminal Procedure (12th ed. 1975) § 483, pp. 342-345.) Stated in another way, "[W]hen

the presence of the defendant will be useful, or of benefit to him and his counsel, the lack of his presence becomes a denial of due process of law." (*Dennis, supra*, 51 Cal.2d at p. 673; see *Boehm, supra*, 270 Cal. App.2d at pp. 19-20; *Teitelbaum, supra*, 163 Cal.App.2d at p. 207.) The burden is upon defendant to demonstrate that his absence prejudiced his case or denied him a fair and impartial trial. (*In re Lessard, supra*, 62 Cal.2d at pp. 506-507; *House, supra*, 12 Cal.App.3d at p. 767; *People* v. *Williams* (1970) 10 Cal.App.3d 745, 752 [89 Cal. Rptr. 364]; *Boehm, supra*, 270 Cal.App.2d at p. 20.)

Both *Boehm, supra*, and *Teitelbaum, supra*, illustrate the application of the foregoing principles. The *Boehm* court held that defendant's presence was not required at an in-chambers discussion culminating in the grant of immunity and dismissal of charges against a codefendant; in *Teitelbaum*, the court ruled that defendant was not entitled to be personally present at any of 34 separate chambers or bench discussions held outside the jury's presence. The *Teitelbaum* court observed that "In none of the instances of conferences at the bench or in chambers, were any matters presented to the court as to which appellant could have been of any aid to his counsel. *Each of them concerned questions of law as to the admissibility of evidence* and any knowledge appellant may have had of the facts which his counsel did not have, would have been of no aid to his counsel in the presentation of these questions of law." (163 Cal.App.2d at p. 207, italics added.)

In the present case, as in *Teitelbaum*, the hearing at issue concerned a question of law regarding the admission of evidence, specifically, the necessity of ordering a mistrial by reason of the admission of Mikles' testimony. Because the testimony at issue had already been placed in evidence in defendant's presence, it is difficult to conceive of any substantial reason why defendant's continued presence would have been of any aid to his counsel in presenting the mistrial motion. Appellate counsel now speculates that had defendant been present at the hearing, he might have moved to discharge his counsel for incompetence in handling the matter. As we have hereinabove observed, however, counsel acted with reasonable competence in investigating and presenting defendant's case.

We conclude that defendant's presence at the mistrial hearing was not required in order to protect defendant's interests, to assure him a fair and impartial trial, or to assist counsel in the defense of the case.

Accordingly, the court did not err in conducting the hearing in defendant's absence.

11. *Admissibility of Witness' Prior Federal Conviction*

 Defendant contends that the trial court erred in excluding for impeachment purposes a prior 1975 robbery conviction of Mikles in a federal youthful offender proceeding. The basis for the trial court's ruling was that under California law a juvenile court adjudication is not considered an impeaching conviction. (Welf. & Inst. Code, § 203; see *In re Ricky B.* (1978) 82 Cal.App.3d 106, 114 [146 Cal.Rptr. 828].)

Defendant urges that under federal law, a prior juvenile adjudication may be admissible for purposes of attacking a witness' credibility if a conviction of that offense by an adult would be similarly admissible and the court is satisfied that admission thereof "is necessary for a fair determination of the issue of guilt or innocence." (Fed. Rules Evid., rule 609(d).)

We need not determine, however, the applicability of the federal rule to a state court proceeding, for it is readily apparent from the record that defendant was not substantially impeded in his impeachment efforts by the challenged trial court ruling. Defendant was permitted to disclose to the jury the fact that Mikles·had suffered a 1977 robbery conviction in state court, and further that he had been convicted of, and was awaiting sentence on, *four* additional robbery counts. Quite clearly, proof of the federal adjudication would have added nothing significant to the force of the impeachment evidence against Mikles which already had been adduced by defendant.

12. *Admissibility of Witnesses' Former Testimony*

 Defendant argues that the trial court erred in admitting the preliminary hearing testimony of two witnesses (Larry Rushing and Debria Lewis) who were unavailable at trial. According to defendant, the prosecutor failed to exercise reasonable diligence in procuring the trial attendance of these witnesses.

Under California law, prior testimony may be introduced if, among other things, the declarant is unavailable as a witness. (Evid. Code, § 1291.) Unavailability may be established by showing that the declarant is "Absent from the hearing and the proponent of his statement has

exercised reasonable diligence but has been unable to procure his attendance by the court's process." (*Id.*, § 240, subd. (a)(5).)

It has been stated that the requirement of due diligence "is a stringent one for the prosecution. It is not sufficient that reasonable diligence has been exercised in an effort to procure a defendant's [*sic,* witness'] attendance 'by the court's process.' A criminal defendant's witness-confrontation right is deemed to require that the prosecution make the additional showing of a good faith effort and reasonable diligence to procure the witness' *voluntary* attendance." (*People v. Salas* (1976) 58 Cal.App.3d 460, 469-470 [129 Cal.Rptr. 871], italics in original; see *People v. Johnson* (1974) 39 Cal.App.3d 749, 755 [114 Cal.Rptr. 545].)

In a recent review of the issue (*People v. Enriquez* (1977) 19 Cal.3d 221, 235 [137 Cal.Rptr. 171, 561 P.2d 261]), for example, we observed that a prosecutor's sole effort to procure the attendance of a witness "was to request issuance of a bench warrant and, at some undisclosed time, to ask the absent witness' mother where he might be located." (19 Cal.3d at p. 236.) No attempt was made in *Enriquez* to serve the warrant or to locate the witness based on information available to the prosecutor. We concluded that the record disclosed "only casual indifference, not diligence, in attempting to serve the warrant on [witness] Prieto." (*Id.*, at pp. 236-237.)

In the present case, in contrast, there is ample evidence in the record supporting the trial court's finding of the prosecution's due diligence. The police officers and their investigators actively sought these two witnesses by interviewing friends and relatives, checking with jails, hospitals and probation officers, and leaving appropriate messages. The trial court heard extensive testimony on the issue and expressly found that given the "lifestyle" of these witnesses (Rushing was characterized as a "fugitive from justice," Lewis was assertedly a prostitute), and the evident difficulties incurred in trying to find them, the prosecutor exercised due diligence under the circumstances.

■ As we recently noted in *Enriquez*, due diligence is a factual question to be determined by the trial court according to the circumstances in each case; under familiar rules the trial court's ruling will not be disturbed unless an abuse of discretion appears. (19 Cal.3d at p. 235; see also *People v. Williams* (1973) 9 Cal.3d 24, 35 [106 Cal.Rptr. 622, 506 P.2d 998].) No such abuse appears herein.

Moreover, even were we to hold that the prosecutor failed to exercise due diligence, any error in admitting the former testimony of witnesses Rushing and Lewis would be harmless beyond a reasonable doubt (see *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *In re Montgomery* (1970) 2 Cal.3d 863, 868 [87 Cal.Rptr. 695, 471 P.2d 15]), because neither witness provided significant, noncumulative testimony. Rushing testified merely that defendant had admitted hitting an elderly lady during the course of a burglary; Lewis was one of several witnesses (Gaines, Hall, Mikles, McFarland) in whom defendant confided regarding his role in the murders. Indeed, as we have noted, defendant's own tape-recorded statement firmly established his complicity in these crimes.

13. *Exclusion of Prospective Jurors*

During the voir dire examination of the jury the trial court excused four prospective jurors who had stated that they would automatically vote against the imposition of the death penalty without regard to the evidence in the case. (See *Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 522, fn. 21 [20 L.Ed.2d 776, 785, 88 S.Ct. 1770].) One of these prospective jurors affirmatively stated that his feelings regarding the death penalty would not affect his ability to determine defendant's guilt or innocence. Defendant evidently acknowledges freely that the views of these prospective jurors regarding the death penalty disqualified them from determining the issue of *penalty* under the *Witherspoon* rule, and our independent examination of the voir dire proceedings discloses that indeed each of these persons was properly excluded under *Witherspoon.* Defendant does contend, however, that exclusion of these jurors resulted in a jury adjudicating *guilt* which was unrepresentative of the community and unduly biased in favor of conviction. Identical contentions were raised and rejected by us very recently in *Hovey* v. *Superior Court* (1980) *ante*, page 1 [168 Cal.Rptr. 128, 616 P.2d 1301], and accordingly need not be reexamined here.

14. *Waiver of Right to Present Mitigating Evidence*

Defendant asserts that the judgment of death must be set aside by reason of the failure of the trial court to obtain his personal waiver of the right to present mitigating evidence at the penalty phase of the trial. Defendant takes the position that his trial counsel's submission of the penalty question to the jury without offering any mitigating

evidence was tantamount to a concession that death was the proper penalty in this case. Defendant relies, by analogy, on cases which require specific and personal waiver by defendant of his various trial rights on entry of a guilty plea or submission of a case on a transcript which would preclude acquittal. (See *Boykin* v. *Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709]; *People* v. *Levey* (1973) 8 Cal.3d 648 [105 Cal.Rptr. 516, 504 P.2d 452]; *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449].)

The contention lacks merit. There is no statutory or decisional authority requiring an on-the-record waiver of the right to present evidence at the penalty phase of a trial. We rejected a nearly identical argument in *People* v. *Murphy* (1972) 8 Cal.3d 349, 365-366 [105 Cal.Rptr. 138, 503 P.2d 594], where defendant contended that the paucity of witnesses called in his defense at both guilt and penalty phases constituted no defense at all, and was tantamount to a guilty plea requiring the court to obtain a waiver under *Boykin-Tahl.* As we noted in *Murphy,* on-the-record waiver principles have no application in trial situations where defense counsel may be expected to advise a defendant of his rights to testify and call witnesses.

We have previously discussed and rejected defendant's related contention that his trial counsel was inadequate and incompetent in failing to present mitigating evidence at the penalty phase. For purposes of the present contention, it seems clear that counsel's submission of the case without offering mitigating evidence on the penalty question cannot be viewed as tantamount to any concession that the death penalty was proper. Trial counsel in argument attempted at length to dissuade the jury from imposition of the death penalty. Counsel's lack of success does not alter our conclusion that the effort was vigorous in application and reasonable in concept. Moreover, nothing in the pertinent statutory provisions or in the jury instructions which were given here suggests that a death penalty was required in the event defendant failed to offer any mitigating evidence. (See former § 190.3.) Accordingly, the foregoing authorities relied on by defendant are neither analogous nor controlling.

Defense counsel is generally authorized to make tactical decisions regarding the introduction of evidence and to control court proceedings, without the necessity of first obtaining a personal waiver from the client. (See *Linsk* v. *Linsk* (1969) 70 Cal.2d 272, 276-278 [74 Cal.Rptr. 544, 449 P.2d 760]; *People* v. *Hill* (1967) 67 Cal.2d 105, 114-115 [60

Cal.Rptr. 234, 429 P.2d 586].) It is noteworthy that defendant personally raised no objection whatever to counsel's submission of the case without introducing mitigating evidence, and further that defendant presently does not call our attention to any specific mitigating evidence which was withheld from the jury's consideration. We conclude that defendant's personal waiver was not required under the circumstances in this case.

## 15. *Constitutionality of 1977 Death Penalty Legislation*

Defendant asserts that the 1977 death penalty law under which he was sentenced is unconstitutional. Most of the arguments advanced by defendant were discussed at considerable length in *People* v. *Frierson, supra*, 25 Cal.3d 142, 172-188, 191-195, and we do not repeat them here. The bases for the claimed invalidity include: (1) the breadth of the jury's discretion to fix the appropriate penalty; (2) the absence of a requirement that the jury render findings explaining its decision; and (3) the absence of any express statutory provisions requiring proportionality review on appeal.

In addition, defendant contends that the 1977 law is constitutionally inadequate in failing to require the existence of at least one aggravating circumstance in order to justify a verdict of death. As explained in *Frierson*, however, the 1977 law requires the presence of at least one "special circumstance" which is an aggravating feature setting the case apart from an "ordinary" murder case. (See *id.*, at pp. 175-179.) Further, the jury is instructed to consider and to be guided by a list of specific aggravating and mitigating circumstances in reaching its decision, a provision equivalent to a requirement that the jury weigh those factors (*id.*, at p. 180). Thus, the aggravated nature of the offense is considered and weighed by the jury in making its determination.

In any event, the record in the present case discloses several aggravating circumstances connected with the two savage murders, including the use of lethal and unusually brutal force against two helpless and elderly ladies, and the vicious sexual abuse of one of them. We observe that defendant has not contended that imposition of the death penalty would constitute "disproportionate" punishment under the facts of this case. (See *id.*, at pp. 180-184.) Indeed, given the aggravating circumstances referred to above, such a contention would have been frivolous.

The dissents of Chief Justice Bird and Justice Mosk would hold the 1977 law unconstitutional on various grounds, most of which were discussed in *Frierson*, but we respond briefly. The dissents suggest that the 1977 law fails to provide adequate standards to guide the sentencing discretion of the trier of fact. This issue was treated at pages 176-178 of *Frierson*, where we focused upon the close resemblance of the California statute to the Georgia and Florida laws which were upheld by the United States Supreme Court in *Gregg* v. *Georgia* (1976) 428 U.S. 153 [49 L.Ed.2d 859, 96 S.Ct. 2909], and *Proffitt* v. *Florida* (1976) 428 U.S. 242 [49 L.Ed.2d 913, 96 S.Ct. 2960].

It is suggested that section 190.3 of the Penal Code, specifying the various aggravating and mitigating factors to be considered by the trier of fact, is invalid in its failure to state expressly which factors are aggravating, and which are mitigating ones. Yet the factors involved (such as the nature of the crime, defendant's prior criminal conduct, the victim's consent or participation, defendant's age or mental capacity) properly require the jury to concentrate upon the circumstances surrounding both the offense and the offender, rather than upon extraneous factors having no rational bearing on the appropriateness of the penalty. We believe that the aggravating or mitigating nature of these various factors should be self-evident to any reasonable person within the context of each particular case.

The Bird dissent further questions whether defendant's diminished capacity due to mental disease or intoxication (§ 190.3, subd. (g)) is a mitigating or aggravating factor. We think it quite obvious that diminished capacity of this type is a mitigating factor. Indeed, this factor is specifically listed as a mitigating factor by the drafters of the Model Penal Code provision on sentencing standards; significantly, the California act seems to have incorporated most of the factors set forth in the Model Penal Code provision, which was referred to with obvious approval by the high court. (See *Gregg* v. *Georgia, supra*, 428 U.S. 153, 193-194, fn. 44 [49 L.Ed.2d 859, 886, 96 S.Ct. 2909].)

The dissents complain of the absence in the California act of any requirement that the jury file written findings disclosing which aggravating factors, if any, were relied upon in imposing the death penalty. As was fully explained in *Frierson* at pages 178-180, (1) the *Gregg* v. *Georgia* et al. decisions impose no such rigid standards regarding the necessity of findings; (2) in any event, the California system bears sufficient similarity to Florida's advisory jury system upheld in *Proffitt* to

pass constitutional muster. Surely, if Florida's system is valid (wherein an advisory jury makes recommendations, without findings, to the trial judge), California's system, which imposes the *additional* safeguard of a jury independently determining the penalty, must likewise be valid. Moreover, unlike the Florida system, California imposes the additional requirement that the trier of fact make a written finding of the existence of "special" circumstances (which are "aggravating" circumstances) before the death penalty may be imposed. (§ 190.4, subd. (a).)

The issue of proportionality review was treated in detail at pages 180-184 of *Frierson*. The Bird dissent revives the argument that because the California Legislature rejected proposed legislation to add proportionality review to the 1977 law, we should not "read into" that law similar provisions in order to preserve its constitutionality. But as *Frierson* explains (pp. 183-184), the Legislature may well have rejected such proposals as wholly *unnecessary* in light of the decisions in *Proffitt* and *Jurek* v. *Texas* (1976) 428 U.S. 262 [49 L.Ed.2d 929, 96 S.Ct. 2950], which preceded the 1977 law and which had upheld Florida and Texas statutes containing no express provision whatever for proportionality review.

It is also suggested that the form of proportionality review which *Frierson* assures will be available (based upon the three-pronged test of *In re Lynch* (1972) 8 Cal.3d 410, 424-427 [105 Cal.Rptr. 217, 503 P.2d 921]) is too narrow because it fails to determine whether the penalty is proportional to other sentences imposed for similar crimes. This statement, however, appears to ignore *Frierson*'s express reference to the second and third prongs of the *Lynch* test, under which a comparable inquiry is to be made. (See *People* v. *Frierson, supra*, 25 Cal.3d 142, 183.) In any event, as indicated in *Frierson* (pp. 183-184), we stand fully prepared to afford whatever kind of proportionality review may be held constitutionally mandated by the high court.

The 1977 death penalty law, as with all legislation, is presumed to be constitutional (*In re Anderson* (1968) 69 Cal.2d 613, 628 [73 Cal.Rptr. 21, 447 P.2d 117]), and it does not "clearly, positively and unmistakably" appear to violate the Eighth and Fourteenth Amendments as construed by the federal cases (see *In re Dennis M.* (1969) 70 Cal.2d 444, 453 [75 Cal.Rptr. 1, 450 P.2d 296]).

CONCLUSION

Defendant has raised numerous contentions regarding asserted trial court errors and trial counsel inadequacies. However, our review of the record convinces us that no more favorable verdict would have resulted had such asserted errors or inadequacies not occurred. Defendant received a fair trial. Mindful as we are of the extreme gravity of the crimes for which defendant stands convicted and of the ultimate punishment which has been imposed, and in view of the overwhelming and uncontradicted evidence of defendant's guilt of each of the offenses charged, and of the presence of special circumstances which permit the imposition of the death penalty, we conclude that no "miscarriage of justice" has occurred within the meaning of article VI, section 13, of the California Constitution.

The judgment is affirmed, and the petition for habeas corpus relief is denied.

Clark, J., and Manuel, J., concurred.

NEWMAN, J., Concurring.—More than a year ago I joined in Justice Mosk's *Frierson* opinion. (25 Cal.3d 142, 188-196.) Yet in the case now before us I am persuaded by neither parts II to IV nor part V of his dissent. Instead I concur with my colleagues who hold that the statute is constitutional and that the judgment of death therefore must be affirmed.

Very briefly I will explain why I do not subscribe fully to any colleague's views. The lead opinion, I believe, answers credibly (1) the questions on adequacy of counsel that have been specified by the Chief Justice and Justice Mosk, and (2) the Chief Justice's objections concerning constitutionality and proportionality. As to the death penalty in general, I still share views expressed by Justice Mosk in *Frierson*. I do not, however, agree with his conclusion that four defects require us to hold the statute unconstitutional.

How much should we demand of the individuals who draft death-penalty statutes? A reasonable and conscientious response to the United States Supreme Court rulings is enough, I think. Since I am persuaded that the California Legislature did so respond, I vote to uphold the statute. There may well be revision of those rulings (see *Frierson, supra,* 25 Cal.3d at pp. 190-195), but "a state court would be rash indeed to pre-

dict how and when the United States Supreme Court will ultimately solve the problem it created in *Furman.*" (*Id.*, at p. 195.)

If the Supreme Court does decide to prescribe certain procedures, how might our approach to cases like this be affected? Should we pronounce that legislative acknowledgment of the new prescriptions is essential and (as Justice Mosk seems to suggest) that all "elementary requirements" must be articulated in a rewritten statute? As recently as last month we stated: "If feasible within bounds set by their words and purpose, statutes should be construed to preserve their constitutionality. [Citations.]" (*Conservatorship of Hofferber* (1980) *ante*, p. 161 at p. 175 [167 Cal.Rptr. 854, 616 P.2d 836].)

California courts and federal courts are not timid in reading into legislation various procedural and other rules deemed constitutionally required that the draftsmen may have overlooked or rejected. That is demonstrably true as to countless requirements on matters such as unanimous verdict, proof beyond a reasonable doubt, and jury or judge findings. Whether there be four such matters or forty (cf. *Hofferber, supra*, at pp. 178-179; *Frierson, supra*, at p. 193, fn. 8) we should not insist, even in death penalty cases, that each requirement be first written out and then enacted by the Legislature.

MOSK, J., Dissenting.—In my view a fair reading of the record demonstrates that defendant was denied constitutionally adequate assistance of counsel at the penalty phase of his trial, and hence that the judgment of death imposed on him cannot stand.

I

It is now settled that the constitutional right of a criminal defendant to the "assistance of counsel" (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15) requires that he be afforded reasonably competent representation by an attorney acting as his diligent, conscientious advocate. (*People* v. *Pope* (1979) 23 Cal.3d 412, 423 (maj. opn.), 438 [152 Cal. Rptr. 732, 590 P.2d 859] (dis. opn. of Mosk, J.); accord, *People* v. *Frierson* (1979) 25 Cal.3d 142, 160 [158 Cal.Rptr. 281, 599 P.2d 587] (opn. of Richardson, J., Clark, J., and Manuel, J.); *People* v. *Cooper* (1979) 94 Cal.App.3d 672, 681 [156 Cal.Rptr. 646]; *People* v. *Farley* (1979) 90 Cal.App.3d 851, 859 [153 Cal.Rptr. 695].) "Reviewing courts should avoid second-guessing counsel's informed choice among tactical alternatives, but a defense attorney's freedom to make such de-

cisions is not without limits. Every person accused of a criminal offense is entitled to constitutionally adequate legal assistance. [Citation.] That right is denied if trial counsel makes a critical tactical decision which would not be made by diligent, ordinarily prudent lawyers in criminal cases. This is true even if the decision were not made from ignorance of the law or a fact." (*Pope*, 23 Cal.3d at p. 424.)

Among the "basic duties" counsel must perform in order to provide reasonably competent assistance are diligent preparation of the client's case and a careful investigation of all defenses of fact and law that may be available. (*Id.* at pp. 424-425.) If counsel's failure to discharge these duties results in the withdrawal of a crucial or potentially meritorious defense, the defendant has been denied his constitutional right. (*Id.* at p. 425.) Absolute certainty, however, is not required: "A crucial defense is not necessarily one which, if presented, 'would result inexorably in a defendant's acquittal.'" (*Id.* at p. 425, fn. 15.)

In applying this rule to the penalty phase of a murder trial, of course, it is inappropriate to speak of "defenses" in the sense in which the word is used in the guilt phase: once it is found that the defendant committed the crime, there is no longer a "charge" pending against him to which he may interpose a "defense." Rather, the penalty phase is in essence a sentencing hearing at which additional information about the defendant is adduced in order to permit a rational decision concerning the proper punishment to be imposed. To this end, the statute governing the trial herein provided that "In the proceedings on the question of penalty, evidence may be presented by both the people and the defendant as to *any matter relevant to aggravation, mitigation, and sentence*," including, but not limited to, such facts as the nature and circumstances of the offense, the existence or lack of prior criminal activity by the defendant involving the use or threat of force, and "the defendant's character, background, history, mental condition and physical condition." (Italics added.) (Former Pen. Code, § 190.3, 1st par., added by Stats. 1977, ch. 316, § 11, p. 1258.) The broad scope of the defendant's right to introduce evidence in mitigation is underscored by the further provision that in reaching its decision the jury shall take into account not only certain listed factors (e.g., the defendant's age, mental state, and degree of participation in the offense) but also "Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." (*Id.*, 5th par., subd. (j).)

The crucial importance of such mitigating evidence is demonstrated by the fact that the statutory provisions for its introduction are not merely matters of legislative policy—they are constitutionally compelled: the Eighth and Fourteenth Amendments require that the sentencer "not be precluded from considering *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (Fn. omitted.) (*Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 990, 98 S.Ct. 2954] (plur. opn. of Burger, C. J.).) There are two reasons for this rule. First, because of the drastic nature of the penalty it is critical that the sentencing authority have full, accurate, and reliable information about the person to be punished: "the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." (Fn. omitted.) (*Woodson* v. *North Carolina* (1976) 428 U.S. 280, 305 [49 L.Ed. 2d 944, 961, 96 S.Ct. 2978] (plur. opn. of Stewart, J., Powell, J., and Stevens, J.).) In a noncapital case "where sentencing discretion is granted, it generally has been agreed that the sentencing judge's 'possession of the fullest information possible concerning the defendant's life and characteristics' is '[h]ighly relevant—*if not essential*—[to the] selection of an appropriate sentence....'" (*Lockett*, 438 U.S. at pp. 602-603 [57 L.Ed.2d at p. 988].) Yet "If an experienced trial judge, who daily faces the difficult task of imposing sentences, has a vital need for accurate information about a defendant and the crime he committed in order to be able to impose a rational sentence in the typical criminal case, then *accurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die* by a jury of people who may never before have made a sentencing decision." (Italics added.) (*Gregg* v. *Georgia* (1976) 428 U.S. 153, 190 [49 L.Ed. 2d 859, 884, 96 S.Ct. 2909] (plur. opn. of Stewart, J., Powell, J., and Stevens, J.).)

Secondly, and even more fundamentally, "The basic concept underlying the Eighth Amendment is nothing less than the dignity of man." (*Trop* v. *Dulles* (1958) 356 U.S. 86, 100 [2 L.Ed.2d 630, 642, 78 S.Ct. 590] (plur. opn. of Warren, C. J.); accord, *People* v. *Anderson* (1972) 6 Cal.3d 628, 650 [100 Cal.Rptr. 152, 493 P.2d 880].) To impose a sen-

tence of death in ignorance of "the defendant's character, background, [and] history" is to deny that dignity and treat the defendant as something less than a human being: "A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death." (*Woodson*, 428 U.S. at p. 304 [49 L.Ed.2d at p. 961].) It follows that "in capital cases the fundamental respect for humanity underlying the Eighth Amendment, [citation], requires consideration of the character and record of the individual offender and the circumstances of the particular offense *as a constitutionally indispensable part of the process of inflicting the penalty of death.*" (Italics added; *ibid.*) (Accord, *Lockett*, 438 U.S. at p. 605 [57 L.Ed.2d at p. 990]; *Rockwell* v. *Superior Court* (1976) 18 Cal.3d 420, 428 [134 Cal.Rptr. 650, 556 P.2d 1101].)

It is self-evident that in most trials the jury will be unable to give any "consideration" whatever to such mitigating factors without the assistance of defense counsel. Unless counsel undertakes a timely investigation to develop this evidence, marshals the witnesses or documents needed to present it, and introduces it at the penalty phase, the jury risks condemning the defendant without the individualized treatment contemplated by the statute and, under *Gregg* and its progeny, mandated by the Constitution. For this reason, defense counsel's basic duty to diligently prepare his client's case and carefully investigate all defenses that may be available (*Pope*, at pp. 424-425 of 23 Cal.3d) includes, in capital cases, the foregoing additional responsibilities. If he fails to so act, and if the failure results in withholding crucial extenuating evidence from the jury, the defendant has not had the representation to which he is constitutionally entitled under the *Pope* rule. As in *Pope*, of course, the defendant need not prove that the evidence in question would "inexorably" have produced a sentence less than death. (*Id.* at p. 425, fn. 15.)

II

Applying this rule to the case at bar I find that the record, when fairly read, supports the defendant's contention that he was denied constitutionally adequate representation at the penalty phase.

To begin with, it is beyond dispute that counsel had more than ample time to prepare for that phase of the proceedings. Despite the strong public policy in favor of a speedy trial in all criminal cases (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; Pen. Code, §§ 686, 1050; *People* v. *Johnson* (1980) 26 Cal.3d 557, 562-563 [162 Cal.Rptr. 431, 606 P.2d 738]), and the implementing statutory mandate that in the absence of good cause or consent a defendant charged with felony must be brought to trial within 60 days after the filing of the information (Pen. Code, § 1382, subd. 2), in the case at bar the trial did not begin until *415 days* after the first information was filed. During all that time defendant was held in the local jail, and for the last 365 days of the period he was represented by the attorney of whom he now complains.[1]

After seven days of jury selection, the People put on a substantial case in chief at the guilt phase: the prosecution called twenty-nine witnesses, and their testimony consumed some eight days of trial.[2] By contrast, defense counsel offered no evidence whatever on defendant's behalf.

In even greater contrast was the testimonial portion of the penalty phase, held on January 9, 1979. While the corresponding portion of the guilt phase lasted more than a week, the entire hearing of testimony on the issue of penalty took less than 45 minutes: two prosecution witnesses were questioned briefly about the location and appearance of the bottle apparently used to sexually assault the victim Ott; defense counsel cross-examined one but not the other; and counsel again declined to offer any evidence whatever on defendant's behalf.

Counsel's failure to present any extenuating evidence, moreover, was repeatedly called to the jury's attention in oral argument. First, the

---

[1] The crimes were committed on August 29 and September 7, 1977. On September 17 defendant surrendered to the police and was immediately jailed. On October 19 the first information was filed, charging him with both murders. After obtaining 12 continuances, the public defender declared a conflict and a private attorney was appointed as defendant's counsel on December 8, 1977. After at least 20 more continuances—one lasting 3-1/2 months and most ordered at the second defense attorney's request—jury selection finally began exactly one year later on December 8, 1978. Indeed, between the arrest and the judgment (Mar. 19, 1979) defendant was held in jail for a total of one and one-half *years*.

[2] The prosecution made its opening statement on December 19, 1978, and its witnesses testified on December 20, 21, 26, 27, 28, and 29, 1978, and January 2 and 3, 1979.

prosecutor structured his presentation on the list of aggravating and mitigating factors that the statute directed the jury to take into account in fixing the penalty. (Former Pen. Code, § 190.3.) Reviewing each of those factors, he found none favorable to defendant except his age at the time of the crime; all the others, he urged, constituted circumstances in aggravation.[3] He then asked the jury, "Is there anything that you have heard during the days of testimony and the offering of evidence to you that in any way diminished the gravity of the crime, the beating of Mrs. Ott? Anything? Obviously not." Again paraphrasing the statutory language, the prosecutor next told the jury: "Then we come down to the last [factor], and that is the defendant's character, his background, his history, his mental and physical condition. *Well, we don't know too much of the defendant, do we*? But what we do know, I would submit to you, is sufficient for you to make a determination of the character of this man, Mr. Jackson." (Italics added.) The prosecutor addressed two of those factors, stressing defendant's evident physical strength and arguing that the circumstances of the crime showed his "mental condition" to be that of a cool, vicious, and pitiless killer. Summing up the point, the prosecutor then emphasized, "So what about the defendant's character, his background, his history, his mental and physical condition? Any factors of mitigation in that regards? Obviously none."

In turn, defense counsel's argument was wholly inconsistent on this topic. Although he made frequent appeals to the jury to consider "where this young man is coming from," he apparently realized that except as to age he had not produced any affirmative evidence of defendant's character, background or history—and like the prosecutor, he persisted in reminding the jury of that omission. Thus he admitted, "you never really got a chance to know [defendant] or see him or talk to him," and could only argue negatively that during the trial "we heard nothing about the things that...I was used to when I was his age... like some type of security." Again, defense counsel urged that "to be fair...we must look into the background of the individual. *Now, you say, Well, I don't know much about him. I don't know much about him.* All I see is this black—black man over here. He looks young." (Italics added.) Indeed, defense counsel doggedly adhered to this technique even in arguing his automatic motion for modification of the

---

[3]Because of the wide disparity in age between defendant and the victim Ott, the prosecutor eventually argued that even defendant's youth was an aggravating circumstance.

verdict (former Pen. Code, § 190.4, subd. (e)): while pressing the court to consider "where he is coming from," counsel acknowledged the prosecution's adverse evidence on defendant's character and could only remark elliptically that "the Court will never know this individual as, say, I know the individual...."[4]

The ignorance of the court and jury on these matters was of counsel's own making. For the reasons explained above (part I, *ante*) it was counsel's duty to present his evidence on the issue of defendant's background and history, rather than asking the court and jury to blindly rely on his unexplained allusions as to "where this young man is coming from." Nor are we required to speculate on what such evidence might have included: the record contains significant material on this issue that counsel could have put before the jury by appropriate witnesses.

The most obvious is the factual information appearing in the probation report—information elicited by the probation officer from sources that were equally accessible to counsel. According to that report, defendant was born in 1957 in Arkansas, the only child of Alfred Jackson and Hollie Walker. When he was four years old his parents separated and his mother took him to California. She subsequently began living with a Mr. Hackworth and had a child by him, now residing with her at an unknown location. Defendant was raised primarily by his paternal grandmother, Mattie Jackson, staying with her in the Long Beach area until he was 17. He was then sent to Oakland to live with his father, who was unemployed and subsisted on welfare and disability payments.

At least one relevant picture of defendant's background and history appeared when the probation officer interviewed defendant's grandmother, Mrs. Jackson. According to the probation report, the latter "states that she raised defendant because his mother did not want him. When defendant was nine he lived with his mother and stepfather for a while and the latter beat him when defendant did not do what he was supposed to do and beat him when he did what he was not supposed to do. Mrs. Jackson also believes that witnesses lied about defendant's part in the crimes, particularly her granddaughter, Debra Hall. Mrs. Jackson describes defendant as being a good kid who came down here in

---

[4]Taking defense counsel at his word, the court found no additional extenuating circumstances and denied the motion. The court noted that in weighing the matter it "considered and evaluated only such evidence as was presented to the jury," and concluded "There is on this record but one mitigating factor, and that is the defendant's age."

1977 to care for her when she was sick." Summing up, the probation officer states in his own evaluation of the case that "Defendant was reared in a home where there was no adult male supervision until he was nine years of age. He was rejected by both parents and then subjected to indiscriminate physical punishment by a stepfather whom he scarcely knew."

None of this information, however, was communicated to the jury. Yet defense counsel well knew of Mrs. Jackson and her support of defendant throughout the trial. First, during the voir dire proceedings on the guilt phase, the judge, defense counsel, and prosecutor held a brief discussion in chambers regarding the latter's complaint that Mrs. Jackson, who was sitting in the courtroom, spoke to the jurors when they passed her on the aisle. The prosecutor expressed concern about the propriety of such contacts, particularly if defense counsel intended to call her as a witness in the penalty phase. Defense counsel stated that Mrs. Jackson was about 90 years old and in his opinion was "very senile"; nevertheless he offered to warn her against talking with jurors. The prosecutor responded, "I would agree that she is elderly. Whether she is senile or not—I don't get that impression, but be that as it may, does counsel intend to call her as a witness in any phase of the trial?" Counsel replied that he did not know yet, but that he might call her "'cause I don't have much going for me and I have to use everything I have got." The judge agreed that he was very reluctant to exclude Mrs. Jackson from the courtroom, adding the poignant remark that "in the strange world in which the defendant now finds himself, his only ally is his lawyer, who is white, and his grandmother, who is black, . . ."

The prosecutor then explained that Mrs. Jackson told him she was just saying hello to the jurors, and that she seemed to answer his questions responsively; it was for this reason that he believed she was not senile. Defense counsel subsequently moderated his view and said, "I have talked to her a little bit. I think she is a little senile." He readily admitted, however, that she had personal knowledge of defendant's background and history: "She raised the boy and . . . he really doesn't have anybody—I checked that out—other than her, . . ." And counsel acknowledged that Mrs. Jackson strongly supported her grandson: commenting that "you can't reason with her" on the question of defendant's guilt, he concluded: "She doesn't want anything to happen to the boy and she knows it is the death penalty and she thinks the boy is innocent, . . ."

Again, at the end of the trial and in the course of his argument for modification of the verdict, counsel told the court that "At no time have I ever heard from" either defendant's mother or father,[5] and "the only one that I have ever heard from or has ever given any interest is his grandmother on his father's side, *who has faithfully always been in court*" during the trial proceedings. (Italics added.) This observation was corroborated by the prosecution witness Johnson, who pointed out Mrs. Jackson sitting in the courtroom during his cross-examination. Indeed, Mr. Johnson's own testimony suggests that he too was a potential witness for the defendant at the penalty phase. He testified that he had known defendant for at least four or five years, during which time he saw him about once a week when defendant visited the teenage boys of the woman with whom Johnson was living; that defendant was "welcomed" in the woman's house; and that Johnson persuaded defendant to surrender to the police because he was "worried about his safety."

In addition, the declarations filed in support of defendant's petition for habeas corpus contain evidence of counsel's failure to develop and present relevant proof of defendant's mental condition, another factor expressly made admissible by the statute. As noted above, the prosecutor argued to the jury that the circumstances of the crimes showed defendant's mental condition to be that of a calculating and deliberate killer. Having failed to introduce any mitigating evidence, defense counsel had nothing with which to counter this argument. Yet it appears that such evidence might well have been developed. Prior to trial, counsel arranged to have defendant examined by psychiatrists on two occasions for the purpose of determining whether there were grounds for interposing a diminished capacity defense at the guilt phase; he did not ask, however, that defendant be examined for any of the factors admissible in mitigation at the penalty phase. In a declaration under penalty of perjury, Steven Hough, head deputy in the Long Beach office of the Los Angeles County Public Defender and a certified criminal law specialist with 14 years' experience, states that a reasonably competent attorney defending a client charged with a capital crime would not have declined to introduce evidence of any mitigating factors without first obtaining expert advice on the presence or absence of all such fac-

---

[5]The implication that defense counsel had simply waited for defendant's parents to come forward of their own accord is not rebutted, for example, by any indication in the record that he made diligent efforts to reach them before trial and persuade them to testify on their son's behalf. On the contrary, according to the time log that defense counsel submitted in support of his application for attorney's fees, the first and only time he contacted defendant's father was in a telephone "interview" held three days *after* the jury returned its verdict of death.

tors, particularly with regard to the defendant's psychological condition. In corroboration of this view, defendant also submitted a declaration in which John M. Stalberg, M.D., a diplomate of the American Board of Psychiatry and Neurology specializing in forensic psychiatry, recites that he has read the psychiatric and police reports in this case and concludes, inter alia, "It is my opinion as a forensic psychiatrist that Mr. Jackson should have been, as a matter of course, given psychological testing, specifically directed to intelligence. Dr. Bailey, in his report, noted that Mr. Jackson is 'illiterate' and the psychiatric materials and transcribed confession would indicate that Mr. Jackson has possibly borderline mental retardation or, at best, below-normal intelligence."

On this showing the issue of adequacy of counsel is controlled by *People* v. *Frierson* (1979) *supra*, 25 Cal.3d 142, 164-166.[6] In a companion petition for habeas corpus filed with his appeal, Frierson submitted declarations of experienced criminal lawyers who expressed the opinion that a reasonably competent defense in a capital case would include presentation of mitigating evidence through lay or expert witnesses. He also offered "several declarations from relatives, friends and acquaintances of defendant containing material which conceivably might have mitigated his conduct. For example, defendant's mother reviewed certain explanatory circumstances surrounding his youth and family difficulties, and an adult friend declared that he had never seen defendant exhibit any signs of violence or hostility." (*Id.* at p. 165.) Such material is essentially indistinguishable from the mitigating evidence that could have been introduced in the case at bar.[7]

I conclude, as we did in *Frierson (ibid.)*, that although these materials in mitigation "are of doubtful legal significance, they do demonstrate the possibility that at least *someone* might have been called to testify on defendant's behalf and to urge that his life be spared. [¶] . . .

---

[6] Although the cited portion of *Frierson* appears in the plurality opinion of Richardson, J., Clark, J., and Manuel, J., the court was unanimous in reversing the judgment on this ground. (See *id*. at pp. 188 (conc. opn. of Mosk, J., and Newman, J.), 196 (conc. opn. of Bird, C. J.), and 199 (conc. opn. of Tobriner, J.).)

[7] It is irrelevant that some of that evidence—the explanation of defendant's cruelly neglectful childhood given by Mrs. Jackson and the favorable appraisal of his character offered by her and implied by the witness Johnson—appears in the record on appeal rather than in declarations filed with the petition for habeas corpus. There is no magic in the latter declarations. Our decision in *Pope* (23 Cal.3d at pp. 425-426) fully authorizes reliance on the appellate record to support a contention of ineffective counsel; and that source, of course, is generally more reliable than ex parte declarations prepared after the fact—often by counsel rather than the affiant—to justify the claims raised in a petition for habeas corpus.

It seems highly unlikely that trial counsel, by the exercise of reasonable diligence, would have been unable to locate a single witness willing to present some mitigating testimony invited by [former section 190.3]." I refuse to believe that on this planet there lives a human being who is utterly without a single redeeming quality.

### III

Under *Pope*, the inquiry shifts at this point to a consideration of the question whether "the record contains any explanation for the challenged aspect of representation." (23 Cal.3d at p. 425.) In *Frierson* such an explanation was offered by the People in the form of a declaration of defendant's trial counsel submitted with the return. We summarized its contents as follows: "counsel asserts that he had unsuccessfully attempted to locate 'friendly' witnesses who might testify on behalf of defendant at the penalty phase. According to counsel, such witnesses would have been subject to intense cross-examination and impeachment, and would have been required to reveal any adverse facts they knew regarding defendant's character. In addition, trial counsel concludes that 'Tactically I determined that no evidence of mitigating factors would be presented at the penalty phase so as to minimize the People's case and to impress the jury with *the weight of the prosecution's burden.*' (Italics added.) Moreover, defendant himself was not called because of counsel's opinion that 'he would make a poor witness.'" (25 Cal.3d at p. 165.)

We found the proffered explanation totally unpersuasive. We ignored counsel's speculative fears of the effect of cross-examination on character witnesses for Frierson, as well as counsel's personal opinion that Frierson would make a poor witness for himself. And we rejected as legally erroneous counsel's "tactic" of withholding mitigating evidence so as to emphasize the prosecution's "burden." We reasoned (*ibid.*) that if counsel believed "the prosecution had the burden of proving to the jury the appropriateness of the death penalty, counsel seriously misunderstood the law." The statute expresses no preference for either penalty —death or life imprisonment without possibility of parole—but leaves the choice to the jury's discretion in the light of the aggravating and mitigating circumstances introduced. We concluded (at p. 166) that "The People took full advantage of their right to introduce *aggravating* evidence," while "Trial counsel's conduct, rather than emphasizing the People's 'burden,' simply underscored the absence of any *mitigating* circumstances in this case, greatly enhancing the likelihood that a verdict

of death would be returned. Moreover, such a result, in our view, was reasonably foreseeable."

On this issue too the case at bar closely resembles *Frierson.* By a supplemental return, the People have submitted a declaration of defendant's trial counsel containing his explanations for his conduct of the penalty phase. Insofar as relevant here he asserts that he did not call defendant to testify in his own behalf because in counsel's opinion "he would make a very poor witness." Counsel also states he did not use the reports of the examining psychiatrists at the trial because they contained "damaging statements" by defendant, and did not call the psychiatrists themselves "because based upon telephone conversations with them, I believed that their testimony would not have been favorable." The latter excuses, of course, are not only self-serving and wholly conclusory but fail to refute Dr. Stalberg's expert opinion that defendant should have been given routine psychological testing in view of his possible "borderline mental retardation."

Lastly, defense counsel divulges two specific reasons why "I purposely did not call any witnesses to the stand at the penalty phase. . . ." As with the trial tactic in *Frierson,* each of these reasons is legally erroneous.

The first reason is that counsel "wanted to create doubt in the minds of the jury relative to whether their limited knowledge of Mr. Jackson's personal involvement merited the death penalty. . . ." Two misconceptions are reflected in this statement. It is true that in the guilt phase it is a valid defense tactic to "create doubt in the minds of the jury," because the prosecution has the burden of proving the defendant guilty beyond a reasonable doubt. But in the penalty phase, as we observed in *Frierson,* the prosecution has no such burden; to imply that raising a "doubt" would somehow foreclose application of the death penalty therefore suggests that here too "counsel seriously misunderstood the law." Furthermore, counsel's plan to restrict the jury to only a "limited knowledge" of his client and his involvement in the events is contrary to the whole purpose of penalty proceedings: as explained above (part I, *ante*), under the governing decisions of the United States Supreme Court those proceedings are constitutionally necessary to provide the sentencing authority with reliable information about the person before it and to insure that he or she be treated as a uniquely individual human being under the Eighth Amendment. (*Woodson* v. *North Carolina, supra,* at pp. 304-305 of 428 U.S. [49 L.Ed.2d at p. 961].) Those pur-

poses are obviously nullified when counsel deliberately refrains from presenting any mitigating evidence whatever at the penalty phase. Again, such a "tactic" can only be explained as the result of counsel's serious misunderstanding of the relevant statutory and constitutional law.

The second reason offered by counsel for withholding extenuating evidence is that "The prosecutor had only introduced minimal evidence at the penalty phase but had other very damaging evidence of other vicious attacks on people by Mr. Jackson which it [*sic*] did not introduce but which could possibly have been admissible in rebuttal if a defense relative to mitigating factors had been presented." The assertion is both factually and legally untenable.

To begin with, one may question counsel's characterization of the renewed testimony describing in detail the bloody bottle used to sexually assault the elderly woman victim Ott as "only...minimal evidence in aggravation." Even less persuasive is counsel's claim that the prosecutor had additional "very damaging evidence of other vicious attacks on people" by defendant that was not introduced. According to the record, while the jury was deliberating on guilt the prosecutor announced that if the penalty phase were reached he intended to offer evidence of certain other criminal activity of defendant as a circumstance in aggravation. The prosecutor's first hurdle, however, was the clear prohibition of the statute that at the penalty phase "no evidence shall be admitted regarding other criminal activity by the defendant which did not involve the use or attempted use of force or violence or which did not involve the expressed or implied threat to use force or violence." (Former § 190.3, 2d par.) The first item the prosecutor proposed to introduce was evidence of a burglary in which defendant took some shirts from an apartment. In an effort to meet the statutory requirement of violence, the prosecutor stated that defendant broke the apartment window with a rock. The trial court rejected the offer, observing that burglary is "more a crime of stealth" than of violence. This reading of the statute is plainly correct. The "force or violence" referred to in former section 190.3 meant force or violence *against the person.* The purpose of this limitation was to place a reasonable restraint of relevance on the number and kind of prior unlawful acts of a defendant that the prosecution should be permitted to introduce at the penalty phase. To extend the statute to include the many offenses involving at least some degree of force *against property* would defeat that purpose. Thus the Legislature cannot have intended that the jury base its decision as to whether the

defendant should live or die on evidence, for example, that he used "force" to break a bicycle lock in order to steal a second-hand bicycle —or, as here, to break a window in order to slip inside an apartment and steal some shirts.[8]

The remaining incidents that the prosecutor intended to prove were a purse-snatching and an instance in which defendant became involved in an altercation with other teenage boys and girls and struck them with his fist. Admittedly these are offenses involving some "force or violence" within the meaning of the statute; but compared with the double murder of which defendant had just been convicted by the jury, they scarcely amount to "very damaging" evidence of other "vicious attacks."[9]

More importantly, counsel was mistaken in believing that the foregoing evidence could have been admitted if he had introduced any mitigating circumstances on defendant's behalf. The prosecutor's second statutory hurdle was the equally clear prohibition that except for evidence of the charged crime and special circumstances found by the jury at the guilt phase, "no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time, as determined by the court, prior to the trial." (Former § 190.3, 4th par.) Because the prosecutor herein failed to give such notice as to the proposed evidence of the purse-snatching and assault and battery, the trial court correctly ruled that "it comes too late"; the court advised the prosecutor that such evidence would be excluded if he offered it at the penalty phase, and the prosecutor therefore declined to do so.

It does not follow, however, that the admissibility of this evidence would somehow have revived if defendant had introduced any evidence

---

[8]The relatively minor nature of that incident is underscored by the probation report herein. According to that report, defendant had only one prior conviction—another potential circumstance in mitigation not revealed to the jury—and it was for breaking and entering a certain apartment and taking some shirts. Defendant explained to the probation officer that he did it to spite the owner for spreading a rumor that he was a homosexual. The punishment, moreover, was commensurate with the offense: defendant was allowed to plead guilty to second degree burglary, proceedings were suspended, and he was placed on probation.

[9]By contrast, in the penalty phase of *Frierson* the prosecutor introduced proof that shortly before the murder the defendant had committed several robberies while armed with a deadly weapon, and at the age of only 15 had shot and killed another boy and joked about it afterwards.

of his own. The statute also contained an exception (*ibid.*) providing that evidence in aggravation "may be introduced without such notice *in rebuttal to* evidence introduced by the defendant in mitigation." (Italics added.) The emphasized phrase, of course, has a settled meaning in both code and case law: it is improper for the prosecution to deliberately withhold part of its case in chief until the rebuttal; the latter is restricted to evidence that is made necessary by the defendant's case, i.e., is responsive to proof introduced by the defendant that is not implicit in his denial of guilt. (Pen. Code, § 1093, subd. 4; *People* v. *Carter* (1957) 48 Cal.2d 737, 753-754 [312 P.2d 665]; accord, *People* v. *Mosher* (1969) 1 Cal.3d 379, 399 [82 Cal.Rptr. 379, 461 P.2d 659]; *People* v. *Golden* (1961) 55 Cal.2d 358, 371-372 [11 Cal.Rptr. 80, 359 P.2d 448].)

This rule applies no less to the penalty phase than the guilt phase. First, its general purpose is equally salutary in both proceedings.[10] Second, the rule serves the specific purpose of the notice requirement of former section 190.3, i.e., to ensure full and fair presentation of information bearing on sentencing by giving the defendant a meaningful opportunity to be heard on the evidence that the prosecution intends to introduce in aggravation. That goal would manifestly be defeated if the prosecution were allowed to keep its aggravating evidence secret until the defendant made any showing in mitigation, however slight—and then to introduce it in the guise of "rebuttal." Such a construction would not only render nugatory the defendant's statutory right to timely notice, it would chill the exercise of his more fundamental right —both statutory and constitutional—to prove extenuating circumstances in an effort to save his own life.

For these reasons the statutory exception to the notice requirement must be limited to evidence that truly "rebuts" the defendant's case in mitigation within the meaning of the foregoing general rule. On the record before us the prosecutor had no such evidence. Proof that defendant committed a purse-snatching and struck some fellow teenagers in a fist fight could indeed have been introduced by the prosecutor as part of his case in chief in the penalty phase if he had given defendant the required

---

[10]"The purpose of the restriction in [§ 1093, subd. 4] is to assure an orderly presentation of evidence so that the trier of fact will not be confused; to prevent a party from unduly magnifying certain evidence by dramatically introducing it late in the trial; and to avoid any unfair surprise that may result when a party who thinks he has met his opponent's case is suddenly confronted at the end of trial with an additional piece of crucial evidence." (*People* v. *Carter, supra,* at p. 753 of 48 Cal.2d.)

notice; yet in no way would that proof have refuted or even been inconsistent with such mitigating evidence as testimony by defendant's grandmother describing the conditions of his childhood or his solicitude towards her, or testimony by a psychologist showing defendant's limited mental capability. Accordingly, the prosecutor's proposed evidence would not have been admissible "in rebuttal to" such testimony, and defense counsel erred in believing the contrary and refusing to call any witnesses for that reason.[11]

## IV

Finally, in *Frierson* we distinguished *People v. Durham* (1969) 70 Cal.2d 171, 191-192 [74 Cal.Rptr. 262, 449 P.2d 198], on multiple grounds: in that case the record showed no specific mitigating evidence that counsel might have offered, and counsel "marshalled 'a spirited and able defense' at the guilt phase," and "conducted substantial cross-examination of the People's witnesses and presented a well-reasoned argument to the jury at the penalty phase" (25 Cal.3d at p. 166). The same facts distinguish *Durham* from the case at bar.

As shown above (part II, *ante*), the record establishes that counsel failed to develop and present specific mitigating evidence on defendant's behalf, offered no defense whatever at the guilt phase, and cross-examined only briefly on the penalty phase. Moreover, rather than being "well-reasoned," counsel's argument to the jury was a rambling pseudo-

---

[11]Defense counsel does not claim in his declaration that he decided against calling Mrs. Jackson as a witness because of her alleged "senility." Nor would such a claim have excused his failure to put on any mitigating evidence whatever. To begin with, the inconsistency of his above-quoted statements that Mrs. Jackson was both "very senile" and "a little senile" underscores the fact that his view on the subject was not an expert medical opinion, but simply a layman's guess after having "talked to her a little bit." The prosecutor, as noted, drew the opposite conclusion from his own questioning of Mrs. Jackson. More importantly, jurors are fully capable of making allowances for the natural infirmities of age in appraising the testimony of an elderly witness, just as they know how to accommodate the testimony of young children, distraught witnesses, or foreigners not conversant with our language or customs. After the trial the probation officer had no difficulty in understanding Mrs. Jackson's explanation of defendant's personal history and kindness towards her; there is no showing why defense counsel could not have asked her to give the same information to the jury. Indeed, even her advanced age could have worked in defendant's favor, countering any implication of the prosecution that defendant was a youth who was habitually cruel to elderly persons. As counsel acknowledged, she was one of the few potential witnesses that he had on the penalty phase, and she had voiced strong support for her grandson. In these circumstances, Mrs. Jackson was "at least *someone* [who] might have been called to testify on defendant's behalf and to urge that his life be spared" (*Frierson*, at p. 165 of 25 Cal.3d).

sociological discourse that purported to ask the jurors to put aside their feelings of racial hatred and fear but unwittingly invoked those very emotions against his client. Thus counsel repeatedly emphasized, in language that would have done credit to the district attorney, that defendant had committed two terrible crimes;[12] but instead of attempting to extenuate this conduct by eliciting sympathy for defendant as a fellow human being caught in the toils of a troubled personal history and a limited mental capability, counsel thoroughly dehumanized him by treating defendant as merely one of the "members of a faceless, undifferentiated mass" of young black criminals assertedly preying on the public today. From this premise counsel drew the dubious argument that the jury should show mercy to "them" so that "they" will learn to show mercy to "us";[13] and counsel repeatedly warned that if the jury fails to spare defendant's life, others just like him will inevitably come forward to take his place and no one will be safe.[14]

---

[12]The argument abounds with such remarks as "you have heard testimony, terrible testimony, gruesome testimony.... It is a terrible crime on both ladies,...[W]e are not talking about civilized acts. We are talking about uncivilized acts on two old ladies, ...[This is a] situation where a young man commits this terrible crime...."

[13]For example, counsel told the jury that "These young individuals have hate in them also. That hate is engendered by things that are all our responsibility and are going to continue our responsibility unless we show the right considerations at the right time and...we don't raise the specter again, because of fear of our neighbors, fear of our friends, fear of where security is...and we start doing the same thing to them that they may potentially do to us."

[14]Thus counsel argued that "it isn't going to stop with Earl Jackson and you have to recognize that. No matter what you decide here in this particular jury, it isn't going to stop with Earl Jackson. It isn't going to stop with Earl Jackson because there is a lot of Earl Jacksons coming, more and more and more. And you and all of us, hiding behind a fence, with a barrier, a little guardhouse up on the hill, isn't going to stop it. It is going to keep comin'...." Counsel then went so far as to assert that "what is important here is that you recognize that in this society *we have created certain monsters* and also in this society we have created certain situations that—we really don't deal with...too well." (Italics added.) Elaborating on his theme, counsel reiterated that "He exists, this Jackson and a lot of other Jacksons. What are we going to do with them? What are we going to do with these young blacks? Is this the answer right here, the way this trial went down...? When it comes out, we will kill them whenever we can. What are we going to do with these young blacks? One thing for sure. One thing for sure is you are not going to take them all out and you are not going to shoot them. If you think like that, you are crazy. [¶] Another thing for sure, you are not going to take them out and put them on a boat and ship them back to Africa, that is for sure. That ain't going to happen here. And another thing for sure is you are not going to create a state and you are not going to take them and ship them in one state, one thing for sure. That is not going to happen. You think it is going to happen, you are dreamin.' They are here to stay." Finally, counsel warned the jury that "if you felt one should get it, you better be pretty darned sure all get it, because the nature of this crime does not indicate that we are going to be selective, because if you are selective, then you are just as wrong as he is."

As defendant correctly observes, on this record he would probably have had a better chance of receiving a sentence of life imprisonment without possibility of parole if his counsel had made no.argument at all. Here as in *Frierson*, therefore, counsel's tactic "simply underscored the absence of *mitigating* circumstances in this case, greatly enhancing the likelihood that a verdict of death would be returned. Moreover, such a result, in our view, was reasonably foreseeable." (Italics omitted; 25 Cal.3d at p. 166.)

For all these reasons, *Frierson* rather than *Durham* is controlling in the case at bar. To hold that this defendant had constitutionally adequate assistance of counsel but Frierson did not, I submit, would be arbitrary and fundamentally unfair. I would therefore reverse the judgment as to penalty in Crim. 20910 and grant the writ of habeas corpus in Crim. 21285.

## V

Because in my opinion a reversal of the judgment as to penalty is required, it is not necessary to reach the issue of the constitutionality of the 1977 death penalty legislation. (*People* v. *Green* (1980) 27 Cal.3d 1, 49-50 [164 Cal.Rptr. 1, 609 P.2d 468].) However, since all my colleagues have spoken on the subject, I shall briefly add my conclusions.

In my separate opinion in *Frierson* (25 Cal.3d at p. 188), I recognized that the validity of the death penalty under the California Constitution can no longer be questioned. (*Id.*, p. 189.) And although I did not then find the penalty to be "clearly, positively and unmistakably" invalid under the United States Constitution, I deemed it prudent to withhold a determination of whether the 1977 act can be construed constitutional on its face. (*Id.*, p. 195.) The reason for such prudence was that we were not there presented with "an otherwise unimpeachable judgment of death." (*Ibid.*) Nevertheless, I did ventilate many of the issues addressed in the present majority opinion and the dissent of the Chief Justice: I refer particularly to the discussion at pages 192 to 193 of my *Frierson* concurrence, and to the points raised in footnote 8 thereof (*id.*, p. 193).

Upon further analysis, I now conclude that the 1977 legislation suffers from some, but not all, of the infirmities itemized by the Chief Justice in her dissenting opinion herein.

First, our statute does not require the sentencing authority to find that at least one of the statutory aggravating factors is proved beyond a reasonable doubt, as in Georgia (*Gregg* v. *Georgia* (1976) *supra*, 428 U.S. 153, 166, fn. 9 [49 L.Ed.2d 859, 870] (plur. opn.)). The jury is told that both guilt and special circumstances must be proved beyond a reasonable doubt, but not aggravation. This creates the risk that the awesome question of whether the defendant should live or die will be decided by "a mere preponderance of the evidence, i.e., 'under the same standard of proof applicable to run-of-the-mill automobile negligence actions.'" (*People* v. *Burnick* (1975) 14 Cal.3d 306, 310 [121 Cal.Rptr. 488, 535 P.2d 352].)

Second, there is no requirement that the jury be unanimous in finding the statutory aggravating factor or factors upon which it bases its decision on penalty. Again, an instruction on jury unanimity must be given as to guilt and special circumstances, but not as to aggravation. This suggests the very real possibility that the jury may condemn the defendant to die without even being able to agree on which aggravating factors were proved—some jurors basing their verdict on one factor, other jurors on another.

Third, there is no requirement that the authority with primary responsibility for fixing the penalty (the jury here,[15] as in Georgia and Texas; the court in Florida), specify in writing the particular statutory aggravating factor or factors upon which it relies in order to reach a sentence of death. Yet this step is essential for a rational review both by the trial court on various post-trial motions and by this court on appeal. "Where the sentencing authority is required to specify the factors it relied upon in reaching its decision, the further safeguard of meaningful appellate review is available to ensure that death sentences are not imposed capriciously or in a freakish manner." (*Gregg*, at p. 195 of 428 U.S. [49 L.Ed.2d at pp. 886-887]; accord, *Proffitt* v. *Florida* (1976) 428 U.S. 242, 251 [49 L.Ed.2d 913, 922, 96 S.Ct. 2960] (plur. opn.).)

Fourth, there is no requirement that the jury find the aggravating factors outweigh the mitigating factors, as in Florida (*Proffitt*, at p. 250 of 428 U.S. [49 L.Ed.2d at pp. 921-922]), nor is the jury instructed that such finding must be unanimous and beyond a reasonable doubt, nor is there any direction as to how much, if at all, the aggrava-

---

[15]See *People* v. *Frierson, supra*, 25 Cal.3d at page 193, footnote 7 (conc. opn. of Mosk, J.).

tion must outweigh the mitigation: i.e., by a slight or mere preponderance, or substantially, or overwhelmingly. Surely these safeguards are also necessary to prevent infliction of the death penalty in the arbitrary and random manner denounced by the United States Supreme Court.

Although the majority purport to find at least some of the foregoing constitutional requirements already in the statute, they do so largely by the device of rewriting the legislation under the guise of construing it. Indeed, in his concurring opinion Justice Newman explicitly claims it would be proper for this court to read into the death penalty statute all present and future constitutional requirements omitted by the Legislature, no matter how fundamental. This technique, of course, violates not only the basic principle of the separation of powers (Cal. Const., art. III, § 3), but also an express ruling of this court in our unanimous decision in *Rockwell* v. *Superior Court* (1976) 18 Cal.3d 420, 444-445 [134 Cal.Rptr. 650, 556 P.2d 1101]. We there rejected an identical suggestion by the People, reasoning (at p. 445) that "They ask us not to interpret, but to rewrite the law.... Decisions as to which criminal defendants shall suffer the death penalty, whether these decisions shall be made by judge or jury, whether and to what extent a jury determination is reviewable by the trial court and/or the reviewing court, and the scope of responsibility to be given this court to safeguard against arbitrary imposition of the death penalty are matters of legislative concern. Were this court to attempt to devise the necessary procedures and criteria we would not only invade the legislative province, but would also be in the position of having to pass objectively on the constitutionality of procedures of our own design." Even the concurring opinion of Justices Clark and McComb in *Rockwell* concluded (*id.* at pp. 448-449) that "Because our Legislature so clearly intended to enact a' constitutional death penalty statute, and because its failure to do so was so clearly caused by the *Furman* court's failure to provide intelligible guidelines for legislation, one is tempted to accept the Attorney General's frank invitation to save the law by rewriting it under the guise of interpretation. However, the courts must not, in this case *or any other*, act as a super-legislature." (Italics added.)

Because the 1977 death penalty legislation contains none of the four fundamental requirements identified herein, I join my dissenting colleagues in finding the act infirm on its face under the Eighth and Fourteenth Amendments to the United States Constitution as construed in *Furman* and *Gregg*.

For all the foregoing reasons I would reverse the judgment as to penalty.

Tobriner, J., concurred.

**BIRD, C. J.**—I respectfully dissent.

Today, this court sends to his death an impoverished, illiterate and possibly retarded 19-year-old black youth by affirming a judgment that this court would not hesitate to reverse if any other offense were involved. I respectfully submit that it is unconscionable to affirm a conviction on a record that indicates the following:

(1) State-appointed counsel made no attempt to independently investigate the prosecution's evidence except to read the police reports.

(2) No investigation of the incident or appellant's involvement was conducted by counsel.

(3) An unexplained and unreasonable delay occurred in obtaining an expert to assist counsel in determining whether appellant had a defense based on his mental condition.

(4) No action whatsoever was taken to discover all the evidence and information known to the state and ensure it would be revealed prior to trial.

(5) Counsel was ignorant of important aspects of the law of criminal procedure.

(6) Counsel completely failed to present any evidence at the penalty phase, which was equivalent to consenting to the entry of a death sentence.

(7) Appellant's counsel was less than forthright in responding to claims of his incompetence at the guilt and penalty phases.

The majority dismiss counsel's failings as nonprejudicial. I cannot agree. Counsel's ineptness in preparing for and handling the guilt and penalty phases of this trial was so egregious as to amount to a denial of due process. A young man's life will be taken by the state as a direct result of these errors.

## I

Counsel for an individual accused of a crime has a "duty to conduct careful factual and legal investigations and inquiries with a view to developing matters of defense in order that he may make informed decisions on his client's behalf...." (*In re Saunders* (1970) 2 Cal.3d 1033, 1041 [88 Cal.Rptr. 633, 472 P.2d 921].) Performance of this duty requires *prompt* investigation and necessitates that counsel "explore all avenues leading to facts relevant to guilt and degree of guilt...." (ABA Standards, Defense Function (Approved Draft 1971) std. 4.1.)

This duty "exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or his stated desire to plead guilty." (*Ibid.*) As the American Bar Association has observed, "[t]he relationship of effective investigation by the lawyer to competent representation at trial is patent, for without adequate investigation he is not in a position to make the best use of such mechanisms as cross-examination or impeachment of adverse witnesses at trial or to conduct plea discussions effectively. He needs to know as much as possible about the character and background of witnesses to take advantage of impeachment.... The effectiveness of his advocacy is not to be measured solely by what the lawyer does in the trial; without careful preparation he cannot fulfill his role. Failure to make adequate pretrial investigation and preparation may be grounds for finding ineffective assistance of counsel." (*Id.*, com. to std. 4.1.)

The duty to conduct "substantial factual inquiry"[1] applies to all criminal cases, but performance of this duty would seem to be of even greater importance in cases where the client's life is at stake. Yet, the record in the present case establishes that counsel's preparation for the guilt phase of the trial was virtually nonexistent. What preparations he did make were either grossly inadequate, extremely tardy or both.

Twenty-nine witnesses testified for the prosecution at the guilt phase of appellant's trial. *Although defense counsel had been appointed more than a year before their testimony began, he did not interview or investigate a single one of these witnesses during that time.* Nor did he employ an investigator to carry out such tasks.[2] His *entire* effort at

---

[1] *In re Saunders, supra,* 2 Cal.3d at page 1048.

[2] While appellant was indigent and could not afford to hire an investigator on his own, Penal Code section 987.9 would have authorized the trial court to appoint and

"witness" interviewing consisted of three one-hour sessions with two of appellant's aunts—neither of whom apparently had any information pertinent to the guilt phase—and one of the three interviews was devoted merely to obtaining "clothes for defendant." Neither of these two persons testified at trial. Thus, in the course of a full year's "preparation" for the trial of a capital case, defense counsel spent *at most* two hours interviewing nonwitnesses about the prosecution's case.[3]

Counsel was also extremely lax in investigating the possibility that his client might have had a diminished capacity defense pertinent to one or both of the homicides. A psychiatric examination of a person accused of a crime should be performed as soon as possible after the events at issue in order that the results accurately reflect the capacity of the individual at the time of the offense. However, trial counsel in the present case waited until the *first trial date*—more than four months after his appointment, and over seven months after the second homicide—to request that a psychiatrist be appointed to examine his client.[4]

Trial counsel in this capital case did not file a formal motion for discovery. He did not even take the simple steps necessary to activate the superior court's informal discovery policy.[5] Instead of pursuing this

pay for an investigator to assist in the defense of his case. Trial counsel did not avail himself of the benefits of this section.

[3]The majority's assertion that the record now before this court fails to disclose "the precise extent of counsel's own pretrial investigative efforts" is not accurate. (See maj. opn., *ante*, at p. 288.) Petitioner backs up his claim of his counsel's failure to investigate by reference to a document filed by trial counsel in the superior court. Counsel listed, under penalty of perjury, the time he spent "in preparation, reading transcript, interviewing witnesses, legal research, interviewing client, or other." This declaration is so detailed that it even reveals a one-hour "interview" with appellant's aunt to obtain clothes for trial and a one-hour telephone call with appellant's father after the trial. Simply by virtue of the details counsel included in the declaration, it is not likely that counsel omitted some investigative efforts he made that pertained to issues at the trial.

Trial counsel was fully aware of the multifaceted attack on his competency. He has responded in an affidavit to those factual matters which he deemed to be inaccurate. He has never contended that the declaration he filed below failed to accurately reflect his investigative efforts as to both phases of appellant's trial. The "precise extent of counsel's own pretrial investigative efforts" is fully established by the record now before this court.

[4]Counsel's delay cannot be attributed to extensive preparation for other aspects of appellant's case. During the period he represented appellant prior to the appointment of a psychiatrist, counsel devoted an average of less than two hours per week of out-of-court time to this case.

[5]This enlightened local policy would have required counsel merely to serve a written request for discovery on the district attorney's office at least 25 days before trial. Once served, the request becomes binding on the prosecution unless the prosecutor follows

minimal course of action, trial counsel relied solely on the good graces of the prosecutor assigned to try the case. While the prosecutor generally provided defense counsel with access to everything *in his files*, problems arose with respect to discoverable materials not in his files, pertaining to the testimony of the two county jail inmates, Mark Mickles and Ronald McFarland.

Mickles had been interviewed by police officers several months before trial, but the officers did not prepare a police report concerning this interview nor did they turn over their notes to the prosecutor. Consequently, defense counsel was not even aware of Mickles' existence as a potential witness until the commencement of the trial. As to the witness McFarland, trial counsel was aware of his testimony prior to trial but discovered during trial that McFarland's statement to the police had been tape recorded. When counsel asked for the tape, the prosecution discovered that it had been lost.

Counsel objected to the testimony of Mickles and McFarland on the basis that the prosecution failed to provide complete discovery. However, as the majority opinion recognizes, counsel never made "a proper request" for discovery. (*Ante*, at p. 308.) Therefore, counsel's objections were based merely upon an asserted violation of the "spirit" or "theory" of discovery and were properly overruled by the trial court.[6]

In addition to these casual efforts to learn all the facts pertaining to the guilt phase of the trial, defense counsel demonstrated poor preparation on issues of law. Prior to trial, counsel brought a motion to suppress appellant's confession to the police. Counsel called this a motion under Penal Code section 1538.5. The theory underlying the motion was the allegedly involuntary nature of the confession. Counsel apparently was ignorant of the fact that a section 1538.5 motion does not lie to suppress a statement on that basis. (See *People v. Superior*

---

the delineated procedures regarding noncompliance. Under the superior court policy, the request "shall be deemed a continuing one." It obligates both the district attorney's office and the investigating police agencies to permit discovery by the accused of "all of the information and/or evidence" in the possession of or known to those departments. The policy allows the imposition of sanctions if the state does not properly comply with the informal discovery request.

[6]At one point, the majority state that defense counsel's arrangement with the prosecutor regarding discovery was "approved by the trial court." (*Ante*, at p. 291.) This quoted portion of the statement is incorrect as a factual matter. Rather, as the majority recognize elsewhere, the prosecution was under no legal duty to furnish discovery in this case because of "the absence of a proper request therefor." (*Ante*, at p. 308.)

*Court* (*Zolnay*) (1975) 15 Cal.3d 729, 733-736 [125 Cal.Rptr. 798, 542 P.2d 1390].) It is permissible to bring such a pretrial motion pursuant to Evidence Code section 402, but the ruling on a section 402 motion, unlike a ruling on a section 1538.5 motion, is not binding on the trial court. (See *Saidi-Tabatabai v. Superior Court* (1967) 253 Cal.App.2d 257 [61 Cal.Rptr. 510].)

Thus, counsel's pretrial motion regarding the voluntariness of the confession should have been renewed before the trial judge and outside the presence of the jury. However, counsel's first feeble efforts to renew the motion were not made until the following events had occurred before the jury: (1) the prosecutor discussed the confession in his opening statement; (2) the officer, who had taken appellant's confession, testified that appellant had made a tape-recorded statement in which he first denied guilt but then said he "would tell us the truth"; (3) the tape recordings were identified by the officer; (4) copies of the transcript of the statement were distributed to all of the jurors; (5) the first tape began to be played; and (6) defense counsel requested that the tape be played at a louder volume. Not until this point did defense counsel speak up and ask to approach the bench. He said he was "not making any objection [but was] just asking for a point of information." He said he "just want[ed] to cover [his] bases." He asked the judge "if it is proper to re-raise that motion [relating to the admissibility of the confession] in front of this Court...." The judge correctly informed counsel it was indeed proper to raise the issue again. The jurors were told not to "read ahead" in the tape transcript, and a hearing was held outside the presence of the jury on the admissibility of the statement. By this time, of course, the jurors were fully aware of the fact of appellant's confession. No matter how the trial court subsequently ruled as to admissibility, the jury could not have been expected to forget it. A more inept handling of a legal motion by an attorney would be difficult to imagine.

The obvious inadequacy of trial counsel was fully established by his failures (1) to investigate the facts and the law and (2) to file any discovery motion. These cumulative omissions would have been inexcusable even in a trial for petty theft. Unfortunately, there is yet another deficiency in counsel's representation. The affidavit filed in this court by trial counsel graphically illustrates a lack of candor with either this court or the trial court.

At trial, counsel objected to the testimony of Ronald McFarland because it violated the "spirit" of discovery. He told the trial court that he did not "find out" about McFarland until the prosecutor's opening statement. When the prosecutor responded that defense counsel had been given the police reports on McFarland several months earlier, counsel answered he had ignored these reports because McFarland's name was not on the prosecutor's witness list.

In his affidavit before this court, counsel now claims that "in fact I had adequate and full discovery from the prosecutor relative to Mr. McFarland." He contends he made a tactical decision not to send an investigator out to interview McFarland because such a course of conduct "would not have been of any benefit." However, it is difficult to reconcile this aspect of counsel's affidavit with his statements and behavior at trial. *Ten days after trial began, counsel asked for the appointment of an investigator to interview McFarland.* This request came so late that even though it was promptly granted, the investigator was unable to contact McFarland until after McFarland had completed his direct testimony.[7] The inability to interview McFarland—far from being of no concern, as is now asserted—required counsel to inform the trial court he was "not prepared to adequately cross-examine Mr. McFarland."[8] As a consequence of counsel's admission, the trial judge delayed cross-examination to a later date.

Despite this abysmal performance by trial counsel, the majority uphold appellant's convictions. In so doing, they ignore that "[t]he right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." (*Glasser* v. *United States* (1942) 315 U.S. 60, 76 [86 L.Ed. 680, 702, 62 S.Ct. 457].)

---

[7]The investigator appointed by the court had previously investigated more than 75 murder cases and 15 death penalty cases. He stated in an affidavit that "it has been my experience over the years that in cases as serious as murder,...attorneys bring me into the case immediately following the preliminary hearing, and sometimes even before the preliminary examination...."

[8]As a sanction against the prosecution's violation of the "spirit" of discovery, trial counsel moved that McFarland be precluded from testifying and stated that he relied on the district attorney's witness list. He said that the list contained "some 32 witnesses to investigate and follow up" and that "those were the witnesses...I checked in preparing this case."

In light of what this court now knows about counsel's investigative efforts, this assertion to the trial court appears disingenuous at best.

In *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065], the Supreme Court noted that denial of the right to counsel was not among those "constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." (*Id.*, at p. 22 [17 L.Ed.2d at p. 709].) On the contrary, the court reiterated its position that the right to counsel is "so basic to a fair trial that [its] infraction can never be treated as harmless error...." (*Id.*, at p. 23 and fn. 8 [17 L.Ed.2d at p. 710].) "That, indeed, was the whole point of *Gideon v. Wainwright* [1963] 372 U.S. 335, overruling *Betts v. Brady* [1942] 316 U.S. 455." (*Id.*, at p. 43 [17 L.Ed.2d at p. 721] (conc. opn. of Stewart, J.).) *Gideon* recognized that a trial without counsel is inherently unfair, even though "defendants faced with overwhelming evidence of guilt might never be able to demonstrate prejudice from the absence of counsel." (*Cooper v. Fitzharris* (9th Cir. 1978) 586 F.2d 1325, 1335, fn. omitted (conc. and dis. opn. of Hufstedler, J.).) See also Comment, *Defects in Ineffective Assistance Standards Used by State Courts* (1979) 50 Colo. L.Rev. 389, 390-391.)

It is clear that "the right to counsel is the right to the effective assistance of counsel." (*McMann v. Richardson* (1970) 397 U.S. 759, 771, fn. 14 [25 L.Ed.2d 763, 773, 90 S.Ct. 1441], citations omitted.) "'After all, the purpose of *Gideon* was not merely to supply criminal defendants with warm bodies, but rather to guarantee reasonably competent representation.'" (*Cooper v. Fitzharris, supra*, 586 F.2d at p. 1338, fn. 11 (conc. and dis. opn. of Hufstedler, J.).) The Supreme Court's decisions have generally reversed criminal convictions for denials of effective assistance, even though counsel may have been physically present throughout the trial, and even though prejudice could not be shown. (*Herring v. New York* (1975) 422 U.S. 853 [45 L.Ed.2d 593, 95 S.Ct. 2550]; *Geders v. United States* (1976) 425 U.S. 80 [47 L.Ed.2d 592, 96 S.Ct. 1330]; *Holloway v. Arkansas* (1978) 435 U.S. 475 [55 L.Ed.2d 426, 98 S.Ct. 1173].)

These cases support the principle that the harmless error rule should not be used as a cure-all to affirm a conviction where there has been a denial of the right to effective assistance of counsel. That right is "more than a right to be free from prejudicial trial errors. The right to competent counsel is also based on considerations of procedural fairness that apply regardless of the strength of the case against an accused."

(*Cooper* v. *Fitzharris, supra*, 586 F.2d at p. 1335, fn. omitted (conc. and dis. opn. of Hufstedler, J.).)

This court has acknowledged that "[i]f in the trial of a serious charge an appointed attorney or even a chosen one grossly neglects the preparation of the case the effect is to deny the defendant the right to counsel." (*In re Rose* (1965) 62 Cal.2d 384, 386, [42 Cal.Rptr. 236, 398 P.2d 428] citation omitted.)

Reversal is required despite an absence of demonstrated prejudice because "the evil lies in what the attorney does not do, and is either not readily apparent on the record, or occurs at a time when no record is made." (*Cooper* v. *Fitzharris, supra*, 586 F.2d at p. 1332.) In such situations, a rule requiring a showing of prejudice "would not be susceptible of intelligent, even-handed application" and would require "unguided speculation." (*Holloway* v. *Arkansas, supra*, 435 U.S. at pp. 490-491 [55 L.Ed.2d at p. 438].)

Consistent with this precedent and its rationale, many courts have required a showing of prejudice when the claim of ineffective assistance of counsel *is* based on errors and omissions at trial.[9] (*Cooper* v. *Fitzharris, supra*, 586 F.2d 1325; *United States* ex rel. *Green* v. *Rundle* (3d Cir. 1970) 434 F.2d 1112; *United States* v. *DeCoster* (D.C. Cir. 1973) 487 F.2d 1197; *Moore* v. *United States* (3d Cir. 1970) 432 F.2d 730.) Even these courts have recognized the need for a different rule when prejudice cannot be determined from the record. For example, the Third Circuit Court of Appeals has said: "In many instances ineffective assistance of counsel may have had so pervasive an effect on the process of guilt determination that it is impossible to determine accurately the presence or absence of prejudice. . . . In such instances a finding of departure from the standard of normal competence requires without more, a new trial." (*United States* ex rel. *Green* v. *Rundle, supra*, 434 F.2d at p. 1115.)

---

[9]This view is consistent with *People* v. *Pope* (1979) 23 Cal.3d 412 [152 Cal.Rptr. 732, 590 P.2d 859]. *Pope* established principles to govern claims of the ineffective assistance of counsel in cases where those claims are based on specific errors or omissions of counsel and the impact of these errors can be readily ascertained. Such principles are inapplicable when the denial of effective assistance of counsel "renders impossible a meaningful assessment of prejudice *on the record*." (*People* v. *Coffey* (1967) 67 Cal.2d 204, 219 [60 Cal.Rptr. 457, 430 P.2d 15], fn. omitted, original italics; see also *Ewing* v. *Williams* (9th Cir. 1979) 596 F.2d 391, 397-399 (dis. opn. of Ely, J.).)

Since counsel failed to investigate the facts and the law in this case, the ineffectiveness of his representation by definition cannot appear on the trial record. As Chief Judge Bazelon has recognized, "proof of prejudice may well be absent from the record precisely because counsel has been ineffective. For example, when counsel fails to conduct an investigation, the record may not indicate which witnesses he could have called, or defenses he could have raised." (*United States* v. *DeCoster, supra*, 487 F.2d at p. 1204, fn. omitted.)[10] Even an evidentiary hearing to establish "why counsel acted or failed to act in the manner challenged"[11] can accomplish no more than raise speculation as to what evidence or witnesses might have been uncovered by prompt investigation, what defenses might have been available had the accused been promptly examined by a psychiatrist, or what other evidence favorable to the defense might have been revealed by interviews and investigations of the prosecution's witnesses.

In addition to violating the Sixth Amendment, the lack of adequate pretrial factual investigation and the failings of counsel at the guilt phase trial also amounted to a denial of due process and fundamental fairness in the context of this capital trial. The United States Supreme Court has long made distinctions between the standards of fairness that apply to capital cases as opposed to other criminal cases. (*Powell* v. *Alabama* (1932) 287 U.S. 45, 71-72 [77 L.Ed. 158, 172, 53 S.Ct. 55, 84 A.L.R. 527]; *Reid* v. *Covert* (1957) 354 U.S. 1, 45-46, 77 [1 L.Ed. 2d 1148, 1179, 1196-1197, 77 S.Ct. 1222] (separate conc. opns. of Frankfurter and Harlan, JJ.).) More recently, the high court has explicitly stated that due process scrutiny is stricter in death penalty cases. (*Woodson* v. *North Carolina* (1976) 428 U.S. 280, 305 [49 L.Ed.2d 944, 961-962, 96 S.Ct. 2978] (opn. of Stewart, Powell, Stevens, JJ.).)

The high court set forth the reasons why a higher standard is required in cases which involve the death penalty. "From the point of view of the defendant, [the death penalty] is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically

---

[10]Pointing out the importance of such investigation, the Third Circuit has recognized that such errors would not be visible in a trial record. "The exercise of the utmost skill during the trial is not enough if counsel has neglected the necessary investigation and preparation of the case or failed to interview essential witnesses or to arrange for their attendance. Such omissions, of course, will rarely be visible on the surface of the trial . . . ." (*Moore* v. *United States, supra*, 432 F.2d at p. 739.)

[11]*People* v. *Pope, supra*, 23 Cal.3d at page 426.

from any other legitimate state action." (*Gardner* v. *Florida* (1977) 430 U.S. 349, 357-358 [51 L.Ed.2d 393, 402, 97 S.Ct. 1197].)[12]

"The assistance of counsel is often a requisite to the very existence of a fair trial." (*Argersinger* v. *Hamlin* (1972) 407 U.S. 25, 31 [32 L.Ed. 2d 530, 535, 92 S.Ct. 2006]; see also *Powell* v. *Alabama, supra*, 287 U.S. at pp. 68-69 [77 L.Ed. at p. 170].) Indeed, the Sixth Amendment right to counsel was considered an "'immutable principle of justice,'" and was one of the first specific guarantees contained in the Bill of Rights which was applied to the states through the due process clause. (*Powell* v. *Alabama, supra*, 287 U.S. at p. 71 [77 L.Ed. at p. 172], quoting *Holden* v. *Hardy* (1898) 169 U.S. 366, 389 [42 L.Ed. 780, 790, 18 S.Ct. 383].)

The question in this case is whether the state may execute a person when his state-appointed attorney failed to properly investigate his case. In a determination of this question, the court must weigh society's interest in the appearance of fairness in the administration of the death penalty. As the Supreme Court has pointed out, "[i]t is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." (*Gardner* v. *Florida, supra*, 430 U.S. at p. 358 [51 L.Ed.2d at p. 402].)

There is indeed an element of caprice in the judgment of death under review. Appellant suffered the random misfortune of the appointment of a state-appointed attorney who failed to independently investigate his case and who lacked knowledge of basic criminal procedure. A ruling such as that being rendered by the majority that this lamentable representation satisfies the highest standard of procedural fairness can only lend credence to the charge that the death penalty is arbitrarily and discriminatorily inflicted upon the poor, who are unable to retain competent counsel.[13]

---

[12]While *Woodson* and *Gardner* were concerned with procedural fairness in the penalty phase of capital trials, the high court recently ruled that: "[t]he same reasoning must apply to rules that diminish the reliability of the guilt determination." (*Beck* v. *Alabama* (1980) 447 U.S. 625, 638, [65 L.Ed.2d 392, 403, 100 S.Ct. 2382, 2389-2390].)

[13]The substance of this complaint was found to be true of pre-1967 death penalty administration by the President's Commission on Law Enforcement and Administration of Justice: "The death sentence is disproportionately imposed and carried out on the poor, the Negro, and the members of unpopular groups." (The Challenge of Crime in a Free Society (1967) p. 143.)

In this case, counsel was either unable or unwilling to investigate his client's cause. "Ultimately, we can never know what would have happened had competent representation been provided, for even seemingly hopeless cases may take unexpected turns in the hands of effective counsel." (*Cooper* v. *Fitzharris, supra*, 586 F.2d at p. 1339 (conc. and dis. opn. of Hufstedler, J.).) How can the court divine what might have happened if counsel had conducted a prompt inquiry into his client's mental status or a thorough investigation of the prosecution's witnesses or careful legal research into matters of discovery and procedure? Under these circumstances, this court should not indulge in "nice calculations"[14] or "unguided speculation."[15] Rather, it should reverse the judgment entered below since appellant did not receive the effective assistance of counsel at either the guilt or penalty phase[16] of his trial.

## II

Next, the constitutional validity of the old 1977 death penalty law must be addressed. The procedures set forth in the old 1977 death penalty legislation[17] differ only superficially from those contained in the pre-1972 death penalty statutes. The pre-1972 laws were declared unconstitutional because they failed to give adequate guidance to judges and juries as to which persons, convicted of capital crimes, should live and which should die. Despite the fact that these statutes are similar, the majority in their opinion curiously find the 1977 legislation constitutional. (See *People* v. *Murphy* (1972) 8 Cal.3d 349, 352, fn. 2 [105 Cal.Rptr. 138, 503 P.2d 594]; see also, *People* v. *Frierson* (1979) 25 Cal.3d 142, 176 [158 Cal.Rptr. 281, 599 P.2d 587] (lead opn. of Richardson, J.).)

The majority err in two important respects. First, they rely on an analysis articulated by *only three* justices of this court in *People* v. *Frierson, supra*, 25 Cal.3d at pages 172-188. Second, the majority ignore the fact that the United States Supreme Court intended its recent

---

[14]*Glasser* v. *United States, supra*, 315 U.S. at page 76 [86 L.Ed. at page 702].

[15]*Holloway* v. *Arkansas, supra*, 435 U.S. at page 491 [55 L.Ed.2d at page 438].

[16]I agree with Justice Mosk's analysis that appellant did not receive the effective assistance of counsel at the penalty phase of his trial.

[17]Former Penal Code section 190 et seq., Statutes 1977, chapter 316, repealed by initiative measure (Prop. 7) on November 7, 1978. See Penal Code section 190 et seq. as enacted by Proposition 7.

All subsequent references in this opinion to code sections shall be to the California Penal Code, unless otherwise stated.

decisions on capital punishment to be more than mere exercises in semantics. A death penalty statute is required by the federal Constitution to provide the judge or jury with "specific and detailed guidance."[18] The 1977 legislation does not meet this important requirement.

The relevant constitutional history begins in 1972 when the United States Supreme Court issued its decision in *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726]. There, the high court held unconstitutional a Georgia statute that gave the sentencing judge or jury complete and unguided discretion as to whether the death penalty should be imposed. Central to this holding was the court's conviction that the lack of sentencing standards "create[d] a substantial risk that the punishment [of death] will be inflicted in an arbitrary and capricious manner." (See *Godfrey* v. *Georgia* (1980) 446 U.S. 420, 427 [64 L.Ed.2d 398, 406, 100 S.Ct. 1759, 1764].)

*Furman* left unresolved two major questions. Can a sentencing judge or jury constitutionally be given *any* discretion in determining whether to impose a death sentence? If some discretion were permissible, how much guidance does the Constitution require in order to avoid the pitfalls identified in *Furman*? These questions were addressed in five companion cases handed down on July 2, 1976.[19] Not only was discretion allowed, it was constitutionally required, at least for the overwhelming majority of crimes.[20] (*Woodson, supra*, 428 U.S. 280; *Roberts (Stanislaus) supra*, 428 U.S. 325.)

---

[18]*Proffitt* v. *Florida* (1976) 428 U.S. 242, 253 [49 L.Ed.2d 913, 923, 96 S.Ct. 2960].

[19]*Gregg* v. *Georgia* (1976) 428 U.S. 153 [49 L.Ed.2d 859, 96 S.Ct. 2909]; *Proffitt* v. *Florida, supra*, 428 U.S. 242; *Jurek* v. *Texas* (1976) 428 U.S. 262 [49 L.Ed.2d 929, 96 S.Ct. 2950]; *Woodson* v. *North Carolina, supra*, 428 U.S. 280; *Roberts (Stanislaus)* v. *Louisiana* (1976) 428 U.S. 325 [49 L.Ed.2d 974, 96 S.Ct. 3001]. Hereinafter, these cases will jointly be referred to as *Gregg* et al.

No single opinion in any of the five cases garnered the signatures of a majority of the court. However, the disposition of each of the cases varied according to the votes of three justices—Stewart, Powell, and Stevens, JJ.—who delivered a joint lead opinion in each case. Those lead opinions have since been deemed the "prevailing opinion[s]" and have been viewed as "the Court's decisions." (See, e.g., *Godfrey, supra*, 446 U.S. at p. 423 [64 L.Ed.2d at p. 403, 100 S.Ct. at p. 1762]; *Coker* v. *Georgia* (1977) 433 U.S. 584, 591-592 [53 L.Ed.2d 982, 989, 97 S.Ct. 2861].)

[20]The possibility was left open that a mandatory death penalty statute might be upheld if "limited to an extremely narrow category of homicide, such as murder by a prisoner serving a life sentence, defined in large part in terms of the character or record of the offender." (*Woodson, supra*, 428 U.S. at p. 287, fn. 7, and p. 292, fn. 25 [49 L.Ed.2d at pp. 950-951, 953-954]; *Roberts (Stanislaus), supra*, 428 U.S. at p. 334, fn. 9 [49 L.Ed.2d at p. 982]; *Roberts (Harry)* v. *Louisiana* (1977) 431 U.S. 633, 637, fn. 5 [52 L.Ed.2d 637, 642, 97 S.Ct. 1993].)

However, at least two courts that have subsequently considered this issue have struck

However, it is an understatement to observe that *Gregg* et al. gave few clear cut answers to the second of the issues left open in *Furman.* The relevant decisions since *Gregg* have not provided the guidance necessary to resolve this question. Nevertheless, certain general themes do emerge. If a state wishes to authorize a death sentence as punishment for murder, "it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." (*Godfrey, supra,* 446 U.S. at p. 428 [64 L.Ed.2d at p. 406, 100 S.Ct. at p. 1764].) It must reserve the death sentence for the most extreme of cases. (*Gregg, supra,* 428 U.S. at p. 187 [49 L.Ed. 2d at pp. 882-883] (opn. of Stewart, Powell, Stevens, JJ.).) Even within this population of extreme offenders, there must be provided a "meaningful basis" for distinguishing the cases in which death should be imposed from those in which it should not. (*Lockett* v. *Ohio* (1978) 438 U.S. 586, 601 [57 L.Ed.2d 973, 987, 98 S.Ct. 2954] (plur. opn. of Burger, C.J.).) Such a "basis" makes it more certain that the decisions of the sentencing judges and juries will be rational and consistent throughout a state. (*Ibid.*) The court also found a constitutional need to ensure the "reliability [of] the determination that death is the appropriate punishment in a specific case." (*Woodson, supra,* 428 U.S. at p. 305 [49 L.Ed.2d at p. 961], fn. omitted (opn. of Stewart, Powell, Stevens, JJ.).)

To effectuate these constitutional goals, the Supreme Court indicated that safeguards are necessary at both the trial and appellate court levels. The state "must channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.'" (*Godfrey, supra,* 446 U.S. at p. 428 [64 L.Ed.2d at p. 406, 100 S.Ct. at pp. 1764-1765], fns. omitted; see also *Woodson, supra,* 428 U.S. at p. 303 [49 L.Ed.2d at pp. 960-961].)

### Controlling the Discretion of the Sentencing Authority at the Trial Level

The Supreme Court has indicated that once an individual has been convicted of a capital offense, there must be "an informed, focused, guided, and objective inquiry into the question whether he should be sentenced to death." (*Proffitt, supra,* 428 U.S. at p. 259 [49 L.Ed.2d at p. 927].) At this proceeding, the sentencing authority is to be both "ap-

---

down mandatory death penalty laws. (*Graham* v. *Superior Court* (1979) 98 Cal. App.3d 880 [160 Cal.Rptr. 10]; *State* v. *Cline* (1979) — R.I. — [397 A.2d 1309].)

prised of the information relevant to the imposition of sentence *and* provided with standards to guide its use of the information." (*Gregg, supra,* 428 U.S. at p. 195 [49 L.Ed.2d at p. 887], italics added; see also, *id.,* at p. 192 [49 L.Ed.2d at p. 885].)

California's 1977 law does permit the introduction of relevant evidence, but it fails to provide (1) standards by which the sentencing authority can evaluate that evidence, (2) safeguards to ensure that the judge or jury does in fact focus on the important or permissible sentencing considerations, (3) a mechanism to ensure that any decision imposing a sentence of death is reliable, and (4) a procedure to enable a reviewing court to meaningfully evaluate a sentencer's decision to take a person's life. Whatever may validly be said as to the lack of clarity of the United States Supreme Court in this area (see, e.g., *Frierson, supra,* 25 Cal.3d at pp. 190-195 (conc. opn. of Mosk, J.)), it is a highly questionable assertion that the high court would uphold this legislative scheme with all its shortcomings.

Preeminent among the shortcomings of the 1977 legislation is its complete failure to provide meaningful standards. The sentencing authority is directed by former section 190.3 to consider "the aggravating and mitigating circumstances referred to in this section . . . ." However, the section explicitly allows consideration of *any* circumstance which the sentencing authority deems to be extenuating. (See former § 190.3, subd. (j).) The statute fails to inform the sentencing authority whether its consideration of aggravating circumstances is similarly open-ended.[21]

Standing alone, this imprecision might not be sufficient to invalidate the 1977 procedures, since former section 190.3 does direct the sentencing authority to consider at least the particular "factors" set forth in subdivisions (a) through (j). The United States Supreme Court has suggested that the constitutional requirement of sentencing guidelines may

[21]The second sentence of former section 190.3 allows the introduction into evidence of, inter alia, "evidence . . . as to any matter relevant to aggravation . . . ." However, the fact that aggravation evidence is admissible does not mean that the sentencing authority may use the evidence in any manner it chooses. The Supreme Court has held that the sentencing authority must be "provided with standards to guide its use of the information." (*Gregg, supra,* 428 U.S. at p. 195 [49 L.Ed.2d at p. 887].) The language of former section 190.3 is problematical in this regard. Although the section instructs the sentencing authority to be guided by "the aggravating . . . circumstances referred to in this section," it is unclear whether those aggravating circumstances are limited to the 10 "factors" listed in subdivisions (a) through (j) or whether "any matter relevant to aggravation" may be used as the basis for imposing a death sentence.

Neither today's majority holding nor indeed the instructions given to appellant's jury addressed this important ambiguity.

be satisfied if the sentencing authority is given "guidance" regarding those factors which "the State, representing organized society, *deems particularly relevant to the sentencing decision.*" (*Gregg, supra,* 428 U.S. at p. 192 [49 L.Ed.2d at p. 885], italics added (opn. of Stewart, Powell, Stevens, JJ.).) The thrust of this language in *Gregg* appears to be to ensure that the state inform the sentencing authority of the primary penological purposes it seeks to advance through its use of capital punishment so that consistency of decision is possible. (See *McGautha v. California* (1971) 402 U.S. 183, 280-287 [28 L.Ed.2d 711, 768-773, 91 S.Ct. 1454] (dis. opn. of Brennan, J.).)

Since the 1977 legislation fails to inform the sentencing authority as to which of the enumerated factors are aggravating circumstances and which are mitigating, the requirements of *Gregg* are not satisfied. If the state intends to advance some penological goal by directing the attention of the sentencing authority to certain specified factors, how can the judge or jury know what that policy is? As a direct result, death penalty verdicts will be random and sporadic rather than consistent. Different conclusions will be reached by different judges or juries as to whether a specified factor is aggravating or mitigating.

For example, former section 190.3 lists as one of the enumerated factors "[w]hether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or the effects of intoxication." (Subd. (g).) Some sentencing authorities, who find the evidence supports this factor, may come to the conclusion that this is a mitigating circumstance. Others, considering the tenor of our times, may consider this a factor favoring execution. The point is that neither sentencing authority can determine whether its version is correct. As a result, identically situated defendants will be sentenced differently. The Legislature, in directing the attention of the sentencing authority to these factors but omitting to indicate whether their presence or absence is a mitigating or aggravating circumstance, set up a statutory scheme that ensures inequality of treatment.

Significantly, none of the death penalty statutes upheld in *Gregg* et al. had the flaw which is part of the 1977 legislation. The Georgia statute directed the sentencing authority's attention to ten factors it deemed to be "aggravating";[22] the Florida law enumerated eight "aggravating"

---

[22]*Gregg, supra,* 428 U.S. at pages 165-166, footnote 9 [49 L.Ed.2d at page 870].

and seven "mitigating" circumstances;[23] and in Texas the jury was informed that "yes" answers to each of the three statutory penalty questions would result in a death sentence.[24]

There is another important flaw. The statutes in Georgia, Florida, and Texas all required the sentencing authority to find at the penalty trial that at least one of the statutorily enumerated aggravating factors was present to justify a decision that a particular defendant should be executed. Also, findings by the sentencing authority had to be in written form.[25] Unfortunately, the California statute has neither of these provisions.

These interrelated provisions serve to ensure that the sentencing authority's discretion has in fact operated within statutory limits. They focus the sentencing authority's attention on the "particularly relevant"[26] sentencing factors. These provisions ensure that persons will not be sentenced to die unless the important penological goals of the state will be advanced. The risk that a death sentence will be imposed for a trivial or impermissible reason is lessened. To this extent, these provisions promote consistency of decision-making. Finally, the requirement that the findings be in writing enables meaningful judicial review of a decision imposing a death sentence.

---

[23]*Proffitt, supra*, 428 U.S. at pages 248-249, footnote 6 [49 L.Ed.2d at page 921].

[24]*Jurek, supra*, 428 U.S. at page 269 [49 L.Ed.2d at pages 936-937]; see *Adams* v. *Texas* (1980) 448 U.S. 38, 41, footnote 1, and page 46 [65 L.Ed.2d 581, 587, 590, 100 S.Ct. 2521, 2524, fn. 1, and pages 2526-2527].

[25]The Georgia statute mandates that before a death sentence may be returned, the sentencing authority must find that at least one of ten statutorily enumerated aggravating factors exists and must "designate in writing...the aggravating circumstance or circumstances which it found beyond a reasonable doubt." (*Gregg, supra*, 428 U.S. at p. 166 [49 L.Ed.2d at p. 870], fn. 9.)

In Florida, the sentencing authority must "'set forth in writing its findings upon which the sentence of death is based as to the facts: (a) [t]hat sufficient [statutory] aggravating circumstances exist...and (b) [t]hat there are insufficient [statutory] mitigating circumstances...to outweigh the aggravating circumstances.'" (*Proffitt, supra*, 428 U.S. at p. 250 [49 L.Ed.2d at p. 921-922], brackets in original.)

Although structured somewhat differently, the Texas procedure also requires at the penalty phase special findings in regard to statutorily specified aggravating factors. The sentencing authority is required to answer certain questions concerning the deliberateness of the defendant's actions, the probability of his future dangerousness, and the reasonableness of his response to any provocation by the deceased. (*Jurek, supra*, 428 U.S. at p. 269 [49 L.Ed.2d at pp. 936-937].) Only if the sentencing authority finds beyond a reasonable doubt against the defendant on all relevant factors shall a death sentence be imposed.

[26]*Gregg, supra*, 428 U.S. at page 192 [49 L.Ed.2d at page 885] (opn. of Stewart, Powell, Stevens, JJ.).

In *People* v. *Frierson, supra*, 25 Cal.3d 142, three justices of this court found no merit in an attack on these procedural defects. Two reasons were tendered in support of their conclusion. First, the justices relied on former section 190.4, subdivision (e), which provides for an automatic application for modification of a verdict whenever a jury has returned a death sentence. (25 Cal.3d at p. 179 (opn. of Richardson, J.).) In ruling on the motion, the trial court must review the evidence, consider the aggravating and mitigating circumstances, make its own independent determination as to the weight of the evidence supporting the jury's findings and verdict, and state on the record the reasons for its findings. The three justices in *Frierson* concluded that the proceedings on such a new trial motion were "roughly comparable" (*ibid.*) to those in the Florida death penalty scheme, which was upheld in *Proffitt*.

The analogy to the Florida statutes is just plain wrong. In Florida, the jury determination of penalty was *advisory* only; the final decision as to punishment was given to the trial judge. In California, the situation is quite different. As Justice Mosk has noted, "under our statute the authority with primary responsibility for fixing the penalty is the jury." (*Frierson, supra*, 25 Cal.3d at p. 193, fn. 7 (conc. opn.).) The jury's role is *not* that of advisor. If there were any doubt as to this fact, "section 190.3 declares no less than three times that in the penalty phase the trier of fact shall 'determine' the punishment to be inflicted." (*Ibid.*) Further, the trial judge has no power to overturn a jury verdict of life imprisonment. In short, the jury is the *sentencing* authority under the 1977 law. The United States Supreme Court's cases "make clear that it is the *sentencer's* discretion that must be channeled and guided by clear, objective, and specific standards." (*Godfrey, supra*, 446 U.S. at p. 437 [64 L.Ed.2d at p. 411, 100 S.Ct. at p. 1769], original italics (conc. opn. of Marshall, J.).)[27]

The second basis on which the *Frierson* plurality sought to overcome these objections was to point out that at the guilt phase of a capital trial the jury must return a verdict of "true" on at least one allegation of special circumstances before the penalty phase may commence. (25 Cal.3d at p. 179.) Since the existence of a special circumstance is one of

---

[27]The procedures called for in the automatic new trial motion are merely those used "for reviewing *any* jury verdict on a motion for new trial based on insufficiency of the evidence." (*Frierson, supra*, 25 Cal.3d at p. 193, fn. 7 (conc. opn. of Mosk, J.).) This would indicate only the fact that the judge found a basis in the record for upholding the jury's decision, whatever the jury's *actual* reasons.

the factors specifically enumerated in former section 190.3 and since the jury's verdict on that allegation at the guilt phase is signed by the jury foreperson, any constitutional need for specific findings in writing was met.

However, the duty of the sentencing authority to return a verdict at the *guilt phase* does not serve as a check against arbitrary and capricious decision-making at the *penalty phase.* A jury which has found a special circumstance allegation to be true is still fully entitled to return a verdict of life imprisonment. The fact that a jury has returned a verdict of "true" at the guilt phase does not in any way imply that the existence of the special circumstance is one of this jury's reasons for sentencing this particular defendant to die. Indeed, the finding of truth of the special circumstance is made at a time when the jury is specifically instructed *not* to consider punishment in arriving at its verdict. (Former CALJIC No. 17.43 (3d ed. 1970).)

The trial level procedures provided by the 1977 death penalty legislation contain another defect; i.e., there are inadequate procedures to ensure the "greater degree of reliability" that is constitutionally required when the death sentence is imposed. (*Lockett, supra*, 438 U.S. at p. 604 [57 L.Ed.2d at p. 989] (plur. opn. of Burger, C.J.).) Of course, it is not possible to eliminate all mistaken sentences of death—there "is always in litigation a margin of error, representing error in factfinding...." (*Speiser v. Randall* (1958) 357 U.S. 513, 525 [2 L.Ed.2d 1460, 1472, 78 S.Ct. 1332].)

Nevertheless, in an analogous context, the Supreme Court has recognized that mistakes in decision-making can and constitutionally must be reduced by imposing upon the government a strong burden of proof. Thus, "[w]here one party has at stake an interest of transcending value—as a criminal defendant his liberty—this margin of error is reduced as to him by the process of placing on the other party the burden of producing a sufficiency of proof in the first instance, and of persuading the factfinder at the conclusion of the trial of his guilt beyond a reasonable doubt." (*Id.*, at pp. 525-526 [2 L.Ed.2d at p. 1472].)

Just as the risks of an erroneous deprivation of liberty justify placing a heavy burden of proof on the government, so must the risks of an erroneous deprivation of *life* require the government to establish convincingly both the appropriateness of the ultimate sanction and the existence of the aggravating circumstances upon which that sanction is

based. Death is, after all, "profoundly different from all other penalties" and "[w]hen the choice is between life and death, [the] risk [that the death penalty will be improperly applied in a particular case] is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." (*Lockett, supra*, 438 U.S. at p. 605 [57 L.Ed.2d at p. 990] (plur. opn. of Burger, C. J.).) Far from imposing a substantial burden of proof upon the government at the penalty phase, the 1977 California statutes impose *no* burden at all. How can legislative silence be deemed an adequate response to the constitutional "interest in reliability"? (*Gardner* v. *Florida, supra*, 430 U.S. at p. 359 [51 L.Ed.2d at p. 403] (plur. opn. of Stevens, J.).)[28]

Another safeguard which would enhance the reliability of any death verdict would be a requirement that the sentencing jury be unanimous as to each aggravating circumstance which the jury deems sufficient to impose a sentence of death. The 1977 law contains no such provision. Indeed, it does not even require a *majority* of the jurors to agree upon the existence of such a factor. Certainly, the constitutional requirement of reliability is not met by a law which allows a death sentence to be imposed for the combined reasons of all jurors, none of which could garner a majority vote.

If the death penalty is to be imposed, it must be done under a system which ensures fair and consistent results at the trial court level. Since the old 1977 California statute fails to meet those essential requirements, a judgment of death based upon it cannot stand.

---

[28]It is true that the Florida death penalty scheme upheld in *Proffitt* did not require proof beyond a reasonable doubt either that the aggravating circumstances were true or that death was an appropriate punishment. However, in Florida, a judgment of death could not be returned unless the aggravating circumstances outweighed the mitigating circumstances. (It is interesting to note that one of the reasons given to the California voters in 1978 in favor of the passage of Proposition 7 was this particular difference between the 1977 statute and the Florida law. The proponents of Proposition 7 stated: "The opposition can't understand why we included the aggravating vs. mitigating circumstances provision in Prop. 7. Well, [any] first-year law student could have told them this provision is required by the U. S. Supreme Court. The old law does not meet this requirement and might be declared unconstitutional, leaving us with no death penalty at all!" (Cal. Voters Pamp., Gen. Elec. (Nov. 7, 1978), rebuttal to argument against Prop. 7, p. 35.))

The Supreme Court has not yet directly considered the question of burden of proof, either in *Proffitt* or in any other recent capital punishment case. Indeed, in *Lockett* v. *Ohio*, the court seemed to suggest that the issue of who should "bear the risk of nonpersuasion" was still open. (See 438 U.S. at p. 609, fn. 16 [57 L.Ed.2d at pp. 992-993].)

When the Supreme Court squarely addresses these issues, it should carefully consider and apply the teachings of *Speiser* v. *Randall, supra*, 357 U.S. 513, to a proceeding in which a decision is made as to whether a person should live or die.

*Proportionality Review on Appeal*

California's 1977 death penalty legislation has another serious flaw since there are inadequate safeguards for appellate review of a judge or jury's decision to impose death. The United States Supreme Court has struck down death penalty statutes which fail to provide for "meaningful appellate review." (*Roberts (Stanislaus), supra*, 428 U.S. at p. 335 [49 L.Ed.2d at p. 983].) To be adequate, legislation must set up a method by which a "full review of the factual basis" for the sentencing authority's decision[29] can be made by "a court which, because of its statewide jurisdiction, can assure consistency, fairness, and rationality in the evenhanded operation of the state law."[30]

The California Legislature failed to provide for such "proportionality review" in enacting the 1977 legislation. An examination of the background and legislative history of this legislation establishes conclusively that the omission was *intentional* and that the Legislature intended to exclude proportionality review from this state's capital punishment law.

Two developments prior to the Legislature's consideration of the 1977 law are relevant. First, this court had consistently and repeatedly held that it had "no power to review the exercise of the jury's or trial court's discretion" which fixed the penalty for capital murder. (*People v. Odle* (1951) 37 Cal.2d 52, 55 [230 P.2d 345]; see also, *In re Anderson* (1968) 69 Cal.2d 613, 623 [73 Cal.Rptr. 21, 447 P.2d 117] and cases cited therein.) Although this court was "importuned on many occasions to exercise such a power[,] [u]niformly, the request [was] rejected." (*People v. Howk* (1961) 56 Cal.2d 687, 699 [16 Cal.Rptr. 370, 365 P.2d 426].)

In December of 1976, this state's then-existing mandatory death penalty laws were held unconstitutional because they violated the principles of *Gregg* et al. (*Rockwell v. Superior Court* (1976) 18 Cal.3d 420 [134 Cal.Rptr. 650, 556 P.2d 1101].)[31] Those laws did not have a provision which included proportionality review. In striking down that legislation, this court specifically held that "[d]ecisions as to...what extent a jury determination [imposing a death sentence] is reviewable by...the re-

---

[29]*Gardner, supra*, 430 U.S. at page 362 [51 L.Ed.2d at page 404].

[30]*Proffitt, supra*, 428 U.S. at pages 259-260 [49 L.Ed.2d at page 927] (opn. of Stewart, Powell, Stevens, JJ.).

[31]The mandatory death penalty laws had been enacted in 1973 in response to *Furman.*

viewing court, and the scope of responsibility to be given this court to safeguard against arbitrary imposition of the death penalty *are matters of legislative concern.*" (*Id.,* at p. 445, italics added.) The court went further and declined to read such requirements into the death penalty statute because that would "invade the legislative province. . . ." (*Ibid.*)

Soon after *Rockwell* was filed, several bills were introduced in the Legislature to reinstate the death penalty. One of these bills, Senate Bill No. 155 (1977-1978 Reg. Sess.), was eventually enacted into law, creating the death penalty provisions now under consideration.

Early in the Legislature's consideration of these bills, a special hearing was called to consider expert testimony on the question of what procedural provisions would be mandated in order to pass a constitutional death penalty law. (See Constitutional Issues Relative to the Death Penalty, Special Hearing, Assem. Com. on Crim. Justice (Jan. 24, 1977).) An "outstanding group of experts" was called to testify. (See remarks of Hon. Kenneth L. Maddy, *id.,* at p. 1.) *The legislators were repeatedly told at the hearing that "the absence of Supreme Court proportionality [review] in a statute. . .is enough to make it unconstitutional."* (*Id.,* at p. 13.)

As originally introduced, Senate Bill No. 155 did not include any statutory provision for proportionality review. Analyses of the bill in both the Senate and the Assembly noted this omission and queried, "Wouldn't the risk of unconstitutionality be unduly high in a statute like S.B. 155 without statewide proportionality review?" (See Bill Analysis of Sen. Bill No. 155 (as amended Mar. 24, 1977) by Assem. Com. on Crim. Justice, at p. 7; see also Bill Analysis of Sen. Bill No. 155 (as amended Feb. 17, 1977) by Sen. Com. on Judiciary, at pp. 6-8.)

On May 16, 1977, an amendment was proposed that would have added proportionality review to Senate Bill No. 155. The amendment read: "In any appeal taken pursuant to subdivision (b) of Section 1239, the Supreme Court shall also consider the punishment to determine whether the sentence was imposed for any arbitrary factor and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering the crime, the circumstances surrounding its commission, and the defendant. The Supreme Court is authorized to make any rules regarding the keeping of the records or any other matter necessary to fulfill the responsibility under this subdivision." (2 Assem. J. (1977-1978 Reg. Sess.) p. 3352.)

The proposed amendment to Senate Bill No. 155 was rejected by a vote of 44 to 30, and the bill was quickly enacted into law with no provision for proportionality review.

In light of all of these developments, the conclusion appears unavoidable that the Legislature has not empowered this court to conduct proportionality review. As one well known authority has stated, "Generally the rejection of an amendment [to a bill that is subsequently enacted] indicates that the legislature does not intend the bill to include the provisions embodied in the rejected amendment." (2A Sutherland, Statutory Construction (4th ed. 1973) § 48.18, p. 224, fn. omitted.)[32] This rule of construction has been followed in California for many years. (See, e.g., *Madrid* v. *Justice Court* (1975) 52 Cal.App.3d 819, 825 [125 Cal.Rptr. 348]; *Rich* v. *State Board of Optometry* (1965) 235 Cal.App.2d 591, 607 [45 Cal.Rptr. 512]; see also *California Mfrs. Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d 836, 846 [157 Cal.Rptr. 676, 598 P.2d 836].)

Nevertheless, the three justices who addressed this issue in *Frierson* decided to "'read into' the 1977 law" the requisite provisions for proportionality review, since those justices were "unable to discern" a clear legislative intent to reject such review. (*Frierson, supra,* 25 Cal.3d at p. 183 (lead opn. of Richardson, J.).) This conclusion can be reached only by ignoring legislative history and violating long established rules of statutory construction. (*Sutherland, op. cit. supra.*) When the Legislature rejected the amendment to insert proportionality review into Senate Bill No. 155, it knew (1) that this court had for years held it had no power to review a sentencing authority's exercise of discretion which imposed a death sentence; (2) that only five months prior to the vote on the proposed amendment, this court had held that proportionality review was a matter of purely "legislative concern" and that for this court to read such a provision into a death penalty legislation would be to "invade the legislative province . . ."[33]; and (3) that constitutional experts and the legislators' own staffs had informed them of the probable need for such a provision in the bill itself for the legislation to be constitutional. In light of these circumstances, it is inconceivable that anyone could conclude that when the Legislature rejected the proportionality

---

[32]There is an exception to this rule when "the bill in substance already includes those provisions" contained in the rejected amendment. (*Ibid.*) Obviously, no such exception is applicable to Senate Bill No. 155.

[33]*Rockwell, supra,* 18 Cal.3d at page 445.

review amendment, it was not rejecting the concept of proportionality review.[34]

In *Rockwell, supra,* 18 Cal.3d 420, this court expressed other reasons which militated against our inserting proportionality review into legislation that did not provide for it. The court would not only have to "attempt to devise the necessary procedures and criteria" but it would "be in the position of having to pass objectively on the constitutionality of procedures of [its] own design." (*Id.* at p. 445.)

The fears underlying these considerations are borne out by the narrow scope of the proportionality review suggested by the lead opinion in *Frierson.* Even if this court could properly defy the Legislature's wishes concerning proportionality review, the kind of review which the three *Frierson* justices vowed to undertake is inadequate under federal constitutional standards.

Quoting from *In re Lynch* (1972) 8 Cal.3d 410, 424 [105 Cal.Rptr. 217, 503 P.2d 921]—a case predating *Gregg* et al. and relying solely on the California Constitution—the three justices in *Frierson* defined proportionality review as an obligation to "determine whether the penalty 'is so *disproportionate* to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.'" (25 Cal.3d at p. 183, emphasis added in *Frierson.*) This test of proportionality is too narrow. It focuses on the proportionality between the punishment and the crime without attempting to "determine whether it is proportional to other sentences imposed for similar crimes." (*Gregg, supra,* 428 U.S. at p. 203 [49 L.Ed.2d at p. 891] (opn. of Stewart, Powell, Stevens, JJ.).)[35]

---

[34]The three justices in *Frierson* pointed out that the United States Supreme Court has upheld or denied review of the death sentencing procedures in states where appellate courts have undertaken proportionality review in the absence of express authorization. (See cases cited at 25 Cal.3d at p. 182.) However, in *none of the cited cases is there any indication that other state courts have adopted proportionality review in the face of a contrary legislative intent.*

[35]In the majority opinion, it is suggested that this writer has focused on only one portion of the *Frierson* discussion of proportionality review ignoring the "express reference" to the second and third prongs of the three-part *Lynch* test. (Maj. opn., *ante,* at p. 317.) With all due respect, I suggest that my colleagues carefully read their own previous opinion. In *Frierson,* the three-prong test of *Lynch* is set forth and then dismissed with this language—"not all of these tests of disproportionality may be appropriate in reviewing a sentence of death in a particular case...." (25 Cal.3d at p. 183.)

The reason why the lead opinion in *Frierson* hedged on the second and third prongs

This deficiency is compounded by the articulation of a wholly subjective standard for finding a death sentence disproportionate: the sentence must "shock the conscience" in light of the crime. Such a standard leaves the appellate court without adequate guidance for determining the proportionality of a particular death sentence. Moreover, the standard appears to be virtually unreachable, since former section 190.2 permits a death sentence only for very serious crimes—first degree murders committed under "special circumstances." It is difficult to believe that in reviewing death sentences imposed on persons convicted of such crimes, a majority of this court will find the sentence so excessive as to shock their conscience or offend their sense of human dignity. Realistically, the kind of "proportionality review" described by the lead opinion in *Frierson* is at best an empty ritual.

Clearly, proportionality review was not meant to be an entirely subjective or perfunctory exercise. Rather, it was designed to provide a significant check on the arbitrariness of judges and juries by assuring consistency throughout the state in the infliction of death sentences. Under the view suggested in *Frierson*, proportionality review does not include this essential comparative function.

It also bears noting that this court is not presently equipped to perform meaningful proportionality review. While this court can monitor those cases in which a death sentence is imposed, it cannot account for cases in which a sentencing authority returns a verdict of life imprisonment. Thus, every automatic appeal reviewed for "proportionality" of sentence can only be compared to other cases wherein death has been imposed. No matter how frequently life sentences may be returned *at the trial level* for similar crimes and similar offenders, all death sentences will appear to *this appellate court* to be consistent.

---

of the *Lynch* test is evident. In the second prong of the test, the court must compare a capital case with "more serious crimes." The third test involves a comparison between the death sentence handed down in California and "punishments prescribed for the same offense in other jurisdictions...." (*Ibid.*) The problem here is that there are no "more serious crimes" than capital murder. Further, it is irrelevant to our proportionality review function to know what "punishments [are] prescribed for the same offense in other jurisdictions." Even if the laws of other jurisdictions were relevant, it is impossible for this court to know how *often* such punishments are actually imposed in those jurisdictions.

Today's attempt to buttress *Frierson* serves only to prove the inappropriateness of trying to apply *Lynch* to the question of the proportionality of a death sentence in a particular case.

Finally, even if this court could properly limit its proportionality review to the record in the individual appeal being decided, the review would be meaningless. The sentencing authority in California is under no obligation to put on the record any of its reasons for imposing the death penalty. Further, it may impose death on the basis of factors not specifically enumerated in former section 190.3. As a result, this court has no way of determining whether any given death sentence was *in fact* arbitrary or based on caprice. The entire scheme for proportionality review set up by the lead opinion in *Frierson* is mere illusion.

In *Frierson, supra*, the lead opinion acknowledged this court's "constitutionally derived responsibility to assess the proportionality of a particular punishment. . . ." (25 Cal.3d at p. 183.) Today, this court's majority opinion states that "we stand fully prepared to afford whatever kind of proportionality review may be held constitutionally mandated by the high court." (Maj. opn., *ante*, at p. 317.) Despite these statements of high resolve, the majority have not undertaken such review as to the present case.

Perhaps the reason for this omission is that such a review is impossible under this statute because there is no way of knowing why *this* jury sentenced *this* young man to die. There is no way of knowing what aggravating circumstances the jurors actually relied on in their decision to impose death. There is no way of knowing which circumstances the jury believed were aggravating and which they deemed mitigating. There is no way of knowing which of the 10 enumerated factors in former section 190.3 were found to be true. There is no way of knowing whether all the jurors agreed on the existence of the same aggravating circumstance(s) or whether only a few agreed on any particular one. There is no way of knowing whether the jury found each aggravating circumstance relied on to have been established by a scintilla of evidence, a preponderance of evidence, clear and convincing evidence, or by proof beyond a reasonable doubt. And there is no way of knowing whether this jury's decision was consistent with those of other juries under like circumstances. In short, this court knows nothing more about the actual reasons why this jury chose to condemn appellant to death than it would have known under the invalid pre-*Furman* law.

This court, in order to uphold the constitutionality of a defective death penalty statute, has set up an illusory scheme that resembles the work of a prestidigitator more than that of a court of law.

## III

Over the years, much has been written about the death penalty. People differ philosophically as to its efficacy as a deterrent to crime. Indeed, there are few issues that generate so much heat while shedding so little light. Perhaps no issue is so emotionally charged. Unfortunately, the political atmosphere this issue creates is more conducive to sensationalism and exploitation than it is to understanding. Thus, in the past some politicians have not been above attempting to advance their careers by playing on the strong feelings this issue engenders.[36]

Against that emotional backdrop, this court must play a very different role. Our job is to carefully and precisely review the record and apply constitutional principles of law so that a fair and just result is reached in each and every case in which a judgment of death has been pronounced. The people of this state placed that responsibility on this court when they enacted the provision presently found in article VI, section 11 of the California Constitution.

To properly discharge our responsibility, two difficult tasks must be undertaken. First, this court must rigorously review the record below for error. If substantive error is present, this court must not hesitate to reverse. That is our job, and we are duty-bound to perform it. Second, this court must measure the adequacy of California's statutes by federal constitutional standards regarding the death penalty, as articulated in the decisions of the United States Supreme Court. Those decisions have set forth rules to ensure that when a state imposes the death penalty, it is done consistently with fair procedure. Regardless of whether they personally favor the death penalty or not, I am certain the citizens of this state would not want this court to uphold the imposition of that penalty if our statute did not meet the essential requirements that the United States Supreme Court has posited.

---

[36]One commentator on the California scene recently made the observation that there currently are groups who "seem to be cranking up a public opinion campaign to force the California Supreme Court to validate the death penalty." He goes on to note that, "[w]hat the campaigners are saying, said simply, is this: [¶] 'If you don't let a couple of guys be knocked off in the gas chamber, we're going to throw you out of office regardless of the law or your opinion of the law.' [¶] That, I say, is a hell of a way to establish the rules for determination of whether a human being lives or dies." (Flynn, *Executing the Unsolvable*, S. F. Examiner (May 14, 1980); see also Wilborn, *Prosecutor Plans Recall Drive Over Ruling on Death Penalty*, Santa Ana Register (June 11, 1980) pp. A1, A10; Rennert, '*No Executions Till Courts Change*,' Sacramento Bee (Apr. 16, 1980) p. A4; *State justice doesn't foresee any deaths on Death Row*, S. F. Examiner (Apr. 11, 1980) p. 8.)

The justices of this court all take an oath of office to follow the law. Although we may disagree on various issues before us, our views are reached conscientiously and consistently with the rigorous demands of our oaths. Nowhere is our exercise of conscientious judgment more critical than in those cases in which the ultimate sanction of death has been imposed.

It is precisely for these reasons that I think it imperative that this court strip away the emotional overlay surrounding this issue and objectively and fairly review the record of this trial and the applicable law. Having done so, I am convinced that this conviction cannot stand.

The failure of the Legislature to write a death penalty statute that sets forth clear guidelines that assure relative equality of treatment; the failure of the Legislature to give the sentencing authority meaningful standards to follow in exercising its discretion; the failure of the Legislature to provide procedures that ensure that the judge or jury focuses on the important and permissible sentencing considerations; the failure of the Legislature to set out a mechanism that would ensure that a reliable determination has been made that death is the proper sentence in a particular case; and the failure of the Legislature to give this court the means or the power to engage in meaningful review of a sentence of death, make it impossible to uphold the 1977 death penalty statute.

These failures of the Legislature are only compounded by the failure of the state-appointed trial attorney to effectively represent his client. Consequently, the judgment entered below should be reversed.

Tobriner, J., concurred

Appellant's petition for a rehearing was denied December 10, 1980. Bird, C. J., Tobriner, J., and Mosk, J., were of the opinion that the petition should be granted.